UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONALD MCCALL,

                              Plaintiff,                    Case No. 13-CV-1947 (KMK)

        -v-                                                 OPINION & ORDER

GENPAK, LLC,

                              Defendant.

Appearances:

Christopher Dale Watkins, Esq.
Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

John Eric Higgins, Esq.
Nixon Peabody, LLP
Albany, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Ronald McCall ("Plaintiff") brings this Action against his former employer, Genpak,

LLC ("Defendant" or "Genpak"), alleging claims related to race/color discrimination under Title

VII, 42 U.S.C. § 1981, and the New York State Human Rights Law ("NYSHRL"). In particular,

Plaintiff brings claims for discriminatory demotion and termination, retaliation, and hostile work

environment. Defendant moves for summary judgment on all claims. For the following reasons,

Defendant's Motion for Summary Judgment is denied.

<u>I.  Background</u>

A.  <u>Factual Background</u>

      1.  <u>The Parties and Relevant Timeline</u>

Genpak is a corporation located in Middletown, NY and is an employer within the meaning of Title VII, § 1981, and the NYHRL.  (Corrected Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s 56.1") ¶ 22 (Dkt. No. 33); Pl.'s Rule 56.1 Reply ("Pl.'s 56.1") ¶ 22 (Dkt. No. 38)[1].)  At Genpak's Middletown plant, and Genpak's other manufacturing facilities outside of New York, Genpak employees manufacture plastic and foam food packaging containers.  (Def.'s 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)

Plaintiff, who is African-American, began working for Genpak in or about September 2010 at the Middletown plant.  (Pl.'s Rule 56.1 Counter-Statement ("Pl.'s Counter 56.1") ¶ 1 (Dkt. No. 38); Def.'s Resp. to Pl.'s 56.1 Counter-Statement ("Def.'s Counter 56.1") ¶ 1 (Dkt. No. 45).)  Plaintiff was employed at the Middletown plant for approximately a year and a half before he was terminated.  (Def.'s 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.)  During the time Plaintiff was employed by Genpak, he was the only African-American employee in the Maintenance Department and one of very few African-American employees in the entire plant.  (Pl.'s Counter 56.1 ¶ 3; Def.'s Counter 56.1 ¶ 3.)  The Parties dispute how many people were employed in the maintenance department, with Plaintiff submitting evidence that there were approximately forty employees, (Pl.'s Counter 56.1 ¶ 3 (citing McCall Decl. ¶ 4 (Dkt. No. 36))), and Defendant

---

[1] In response to Defendant's Rule 56.1 Statement, Plaintiff filed a single, consolidated document comprising (1) Plaintiff's Rule 56.1 Reply, which is an item-by-item response to Defendant's Rule 56.1 Statement, and (2) Plaintiff's Rule 56.1 Counter-Statement, which is its own, freestanding Rule 56.1 Statement.  (*See* Pl.'s Rule 56.1 Reply and Counter-Statement 1, 39 (Dkt. No. 38).)  For ease of reference, this Opinion will refer to these two components of the Plaintiff's submission separately, even though they, together, compose one document.

submitting evidence that there were approximately twelve to fifteen employees at any given time, (Def.'s Counter 56.1 ¶ 3 (citing Att'y's Decl. of John E. Higgins in Supp. of Def.'s Mot. for Summ. J. ("Higgins Decl.") Ex. G (Dkt. No. 22))).  Defendant also has submitted evidence that between 2010 and 2012 there were approximately eleven or twelve African-American employees working at the Middletown plant in general at any given time.  (Def.'s Counter 56.1 ¶ 3.)

At all relevant times, a majority of the employees at the Middletown plant have been represented by a union and covered by the terms of a collective bargaining agreement ("CBA").  (Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)  Plaintiff was a member of the International Association of Machinist and Aerospace Workers, AFL-CIO (the "Union") for the duration of his employment with Defendant, and he was covered at the time of his termination by the CBA that was effective from February 1, 2012 through February 1, 2016.  (Def.'s 56.1 ¶¶ 44–45; Pl.'s 56.1 ¶¶ 44–45.)  The CBA governed, for example, Plaintiff's hours of work, overtime, holidays, wages, vacations, seniority, leaves of absence, the filing of grievances and demands for arbitration, and discipline and discharge.  (Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.)  Before the current CBA became effective on February 1, 2012, Plaintiff's employment was governed by the terms of a previous, similar collective bargaining agreement.  (Def.'s 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.)

During the time Plaintiff was employed at Genpak, Betty Hager ("Hager") was the Plant Manager.  (*See* Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.)[2]  When Plaintiff first started working for Genpak in September 2010, his supervisor was Maintenance Supervisor Robert Garrett ("Garrett"), and he also was supervised by former Genpak Maintenance Manager Chris Schou

---

[2] At times, Defendant spells Ms. Hager's name "Hagar."  However, it appears from the company's records that her name is actually spelled Hager.

("Schou").  (Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 102.)  Tony Crum ("Crum"), who is white, was a co-worker of Plaintiff's.  (Pl.'s Counter 56.1 ¶ 10; Def.'s Counter 56.1 ¶ 10.)  Darryl Decker ("Decker") was a senior mechanic at Genpak.  (Pl.'s Counter 56.1 ¶ 12; Def.'s Counter 56.1 ¶ 12.)[3]  Dave Walker ("Walker") was a co-worker of Plaintiff's.  (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.)  Louisa Carpanini ("Carpanini") was the company's Human Resources Manager.  (Def.'s 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)  Finally, Cathi Sawchuk ("Sawchuk") was the Director of Human Resources; Carpanini reported directly to Sawchuk.  (Def.'s 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.)

### 2.  Defendant's Policies

#### a.  Discrimination Policies and Internal Complaint Procedures

Throughout Plaintiff's employment with Genpak, the company had anti-discrimination policies that outlawed race-based discrimination.  (*See* Def.'s 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)  The CBA also set forth a grievance policy, whereby Plaintiff was permitted to file a grievance about any condition of his employment, including discrimination.  (*See* Def.'s 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.)  Genpak also had a Corporate Policy Prohibiting Harassment and Discrimination.  (Def.'s 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.)  Plaintiff received a copy of this Policy on his first day.  (Def.'s 56.1 ¶ 65; Pl.'s 56.1 ¶ 65.)  In part, the Policy provided that it was the employee's obligation to follow the reporting procedures if he had a concern or complaint about a possible violation of the Policy and that it was his responsibility to clearly communicate to management any concern he had about behavior or statements made in the workplace.  (Def.'s 56.1 ¶ 66; Pl.'s 56.1 ¶ 66.)  The

---

[3] In response to Plaintiff's assertion that "a senior mechanic named Darryl Decker told [P]laintiff that Decker's dog was named, 'Nigger,'" Defendants respond that "[u]pon information and belief, Deny based on the facts set forth in the Reply Declaration of Robert Garrett."  (Def.'s Counter 56.1 ¶ 12 (citing Reply Decl. of Robert Garrett in Further Supp. of Genpak's Mot. for Summ. J. ("Garrett Reply Decl.") ¶ 6 (Dkt. No. 43)).)  However, that portion of Garrett's declaration does not relate to Decker's position at Genpak.  *See* Garrett Reply Decl. ¶ 6.  In any event, even if Decker's job title truly were in dispute, that dispute would be immaterial.

Policy also provided that retaliation for making a report or participating in any investigation was prohibited and that inappropriate conduct would result in appropriate disciplinary action, up to and including dismissal.  (Def.'s 56.1 ¶ 70; Pl.'s 56.1 ¶ 70.)  The Policy provided that employees should comply with the following procedures to lodge internal complaints:

> Any individual who believes that he or she has been subjected to harassment or discrimination on any prohibited basis, or who has observed such harassment or discrimination, or believes he/she has been subjected to retaliation should notify his or her supervisor, their Human Resource Manager or the Corporate Director of Human Resource[s].  The Corporate Director of Human Resources may be contacted at 518-798-9511 ext 202.  If the complaint involves someone in the employee's direct line of supervision, the employee should inform their Human Resources Manager of the complaint.  The Company will investigate the matter and take such action as is warranted under the circumstances.

(Def.'s 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.)

It is undisputed that Plaintiff never filed a grievance pursuant to the terms of the CBA alleging that he was discriminated against due to race.  (*See* Def.'s 56.1 ¶¶ 60–61; Pl.'s 56.1 ¶¶ 60–61.)  As will be discussed later in greater detail, there is an issue of fact about whether Plaintiff reported that he had been discriminated against under the Harassment and Discrimination Policy procedures.  (*Compare* Def.'s 56.1 ¶ 72 *with* Pl.'s 56.1 ¶ 72.)

### b.  Genpak's Timeliness Policies

#### i.  No Fault Absentee Policy

Genpak had a "No Fault Absentee Policy," under which employees were given points for occurrences such as being absent, late, or leaving early without permission.  (Pl.'s Counter 56.1 ¶ 42; Def.'s Counter 56.1 ¶ 42.)  Plaintiff received a copy of the No Fault Absentee Policy on his

first day.  (Def.'s 56.1 ¶ 79; Pl.'s 56.1 ¶ 79.)[4]  The Policy provides that points will accumulate as

follows:

> Any employee not calling in to report lateness/absence at least 1 hour before the start of their scheduled shift: 1 point
>
> Reporting late for scheduled shift: 1 point
>
> Leaving work early: 1 point
>
> Each day of absence: 3 points
>
> Each day of consecutive absence, regardless of the duration, after the initial day, including partial days: 1 point
>
> Each day of absence, including partial days, missed immediately before or following scheduled time off: 3 points
>
> Personal leave of absence - each 30 day period: 2 points

(Def.'s 56.1 ¶ 82; Pl.'s 56.1 ¶ 82.)  The Policy further states:

> Any employee who has perfect attendance, with no occurrences charged in a consecutive four (4) week period, shall receive a -1 point deduction.  Any employee who has perfect attendance for a second consecutive four (4) week period shall receive a -2 point deduction.  It remains at a -2 point deduction for each perfect consecutive four (4) week period thereafter until an occurrence exists.

(Def.'s 56.1 ¶ 83; Pl.'s 56.1 ¶ 83.)  Finally, the Policy indicates that the "company may allow at

its discretion for two (2) doctor's notes per year for excused absences—one in the first six

months and one in the second six months."  (Def.'s 56.1 ¶ 84; Pl.'s 56.1 ¶ 84.)

The workweek, as defined by the CBA, is Monday through Sunday, and a normal

workweek is eight consecutive hours including a thirty-minute lunch.  (Def.'s 56.1 ¶ 48; Pl.'s

---

[4] Plaintiff admitted only that he received a copy of this policy, but not that he received it on his first day.  (*See* Pl.'s 56.1 ¶ 79.)  However, Plaintiff did not cite any evidence to support a finding that he did not receive it when he started.  (*See id.*)

56.1 ¶ 48.)  Each employee also gets two ten-minute breaks per shift, one in the first half and one in the second half of the shift.  (Def.'s 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)

The Policy provides for discipline based on the accrual of absence points.  In particular, the policy states:

> Progressive discipline will be administered according to the following number of net occurrences (0-24).  (NOTE: YOU CANNOT HAVE LESS THAN 0 OR MORE THAN 24 POINTS.)

| | |
|---|---|
| Verbal Warning | 6 net occurrences |
| Written Warning | 12 net occurrences |
| Final Warning 3 Day | 16 net occurrences |
| Suspension | 20 net occurrences |
| Termination | 24 net occurrences |

(Def.'s 56.1 ¶ 91; Pl.'s 56.1 ¶ 91.)

### ii.  Genpak's Recordkeeping Practices

The hours and attendance of all Union employees have been tracked and recorded on a daily and weekly basis through use of a time clock.  (Def.'s 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) Beginning on November 13, 2011, all employees were required to punch in and out of work for breaks and lunches, in addition to at the beginning and end of their shifts.  (Def.'s 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

Carpanini, as well as Union representatives, reviewed the time and attendance of all employees at the end of each four-week block of time.  (Def.'s 56.1 ¶ 54 (citing Corrected Decl. of Louisa Carpanini in Supp. of Genpak's Mot. for Summ. J. ("Carpanini Decl.") ¶ 15 (Dkt. No. 32)).)[5]  Additionally, Genpak kept annual Employee Data Calendars and other time and attendance records, which were maintained and periodically reviewed by Carpanini, the Union,

---

[5] Plaintiff has stated that he lacks sufficient information to admit or deny this claim by Defendant.  (Pl.'s 56.1 ¶ 54.)

Union employees, and managers for purposes of ensuring compliance with the No Fault Absentee Policy, among other things.  (Def.'s 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.)

### 3.  Plaintiff's Employment

#### a.  Plaintiff's Hiring, Promotion, and Demotion

Prior to being hired, Plaintiff was interviewed by former plant manager Hager in a face-to-face interview.  (Def.'s 56.1 ¶ 98; Pl.'s 56.1 ¶ 98.)  Thus, Hager knew that Plaintiff was African-American during the interview and when she hired him to work for Defendant.  (Def.'s 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.)  Plaintiff was first hired as a mechanic's helper in the Maintenance Department in September 2010.  (Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 102; Pl.'s Counter 56.1 ¶ 1; Def.'s Counter 56.1 ¶ 1.)  As noted above, his supervisor when he first started working at Genpak was Garrett, (Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 102), and he was also supervised by former Genpak Maintenance Manager Schou, (Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 102).

Plaintiff met the qualifications for his job as a mechanic's helper and completed his 90-day probationary period on December 20, 2010.  (Def.'s 56.1 ¶ 104; Pl.'s 56.1 ¶ 104.)  At the end of the probation period, Garrett reported that Plaintiff's probationary period did not need to be extended and that Plaintiff "me[t] the qualifications of his job and more."  (Pl.'s 56.1 ¶ 104 (citing Watkins Aff'n Ex. 1 (Performance Review) (Dkt. No. 35)); *see also* Watkins Aff'n Ex. 1 (Performance Review).)  Plaintiff bid on, and won, a promotion in accordance with the CBA, and was promoted to a position as a shift mechanic trainee in the Maintenance Department, effective December 27, 2010.  (Def.'s 56.1 ¶¶ 105–06; Pl.'s 56.1 ¶¶ 105–06.)[6]

---

[6] Plaintiff asserts that he was the most qualified bidder with the most seniority and that he had been hired into a position below his qualifications.  (Pl.'s Counter 56.1 ¶ 9 (citing Watkins Aff'n Exs. 1, 2).)  However, Defendant disputes these assertions and the evidence Plaintiff cites does not support them.  *See* Def.'s Counter 56.1 ¶ 9; Watkins Aff'n Ex. 1, 2.

Approximately seven months later, on or around July 12, 2011, in a meeting attended by Plaintiff, Hager, Schou, Carpanini, and Alex Augustin, a Union representative, Plaintiff was given the choice of being demoted to his original position of mechanic's helper or having his employment terminated.  (Def.'s 56.1 ¶ 113; Pl.'s 56.1 ¶ 113.)  Plaintiff chose the demotion.  (McCall Decl. ¶ 12.)  The evidence shows that Hager made the decision to demote Plaintiff.  (*See* Def.'s 56.1 ¶ 117; Pl.'s 56.1 ¶ 117.)  The evidence further shows that there were two stated bases for the demotion: that Plaintiff took too many breaks and that Plaintiff was unable to perform the job adequately.  (*See* Def.'s 56.1 ¶ 114; Pl.'s 56.1 ¶ 114; Pl.'s Counter 56.1 ¶ 20; Def.'s Counter 56.1 ¶ 20; Higgins Decl. Ex. A ("McCall Dep. Tr.") 197–200; Higgins Decl. Ex. B1, at unnumbered 37; Carpanini Decl. ¶¶ 70–72.)[7]  According to Plaintiff, Hager told him that he took too many breaks, but when she provided examples as to times he allegedly was on break, Plaintiff asserted that he was actually working at those times.  (Pl.'s Counter 56.1 ¶ 20 (citing McCall Decl. ¶ 12).)  Defendant does not dispute that Hager told Plaintiff that the other shift mechanics said that he took too many breaks and that he would be monitored because of his excessive breaks if he were put back in his helper position, but Defendant disputes the remainder

---

Additionally, in its Memorandum of Law, Defendant asserts that it is "undisputed" that Hager promoted Plaintiff to a Shift Mechanic Trainee.  (Mem. of Law in Supp. of Genpak's Mot. for Summ. J. ("Def.'s Mem.") 3 (Dkt. No. 17) (citing Def.'s 56.1 ¶ 106).)  There is no evidence that Hager was the one who decided to promote Plaintiff, (*see* Def.'s 56.1 ¶¶ 105–06), and at oral argument, counsel represented that Hager did not decide to give Plaintiff a promotion, but that she signed off on it.

[7] Here and elsewhere, Plaintiff's counter 56.1 Statement cites to Exhibit B to the Higgins Declaration, apparently intending to cite to the McCall deposition transcript, which is Exhibit A.  (*See, e.g.*, Pl.'s Counter ¶¶ 21–22.)  In such instances, this Opinion refers to Plaintiff's citations as though Plaintiff had cited to the McCall deposition transcript.

Because Exhibit B1 to the Higgins Declaration contains a collection of different documents, for the sake of clarity, the Court will refer to it as if it were a consecutively paginated document.

of Plaintiff's assertion. (Def.'s Counter 56.1 ¶ 20.) However, Defendant does not cite any evidence in support of the proposition that Plaintiff was not working at those times, or that Plaintiff challenged Hager's assertion that he took too many breaks. (*Id.*) The second stated basis for Plaintiff's demotion was that he lacked the ability to be a mechanic. (Pl.'s Counter 56.1 ¶ 21; Def.'s Counter 56.1 ¶ 21.) According to Plaintiff, Hager told him that Walker told her that Plaintiff had been spoken to and given several chances, but that he lacked the ability to be a mechanic. (Pl.'s Counter 56.1 ¶ 22 (citing McCall Dep. Tr. 198–99).) Defendant denies that Walker played any such role in this decision, but nothing in the materials cited provides evidence that contradicts this. (*See* Def.'s Counter 56.1 ¶ 22 (citing Def.'s 56.1 ¶¶ 112–16; Carpanini Decl. ¶¶ 68–72); Def.'s 56.1 ¶¶ 112–16; Carpanini Decl. ¶¶ 68–72.) Hager also told Plaintiff that supervisors did not think that he was capable of doing the job. (Pl.'s Counter 56.1 ¶ 23; Def.'s Counter 56.1 ¶ 23.)

Plaintiff points to several pieces of evidence in support of his assertion that he was indeed qualified to perform his job. First, Plaintiff asserts that after his demotion back to mechanic's helper, he continued to perform the same work he had as a mechanic trainee. (Pl.'s Counter 56.1 ¶ 27 (citing McCall Decl. ¶ 13; Decl. of Tony Crum ("Crum Decl.") ¶ 8 (Dkt. No. 37)).) Plaintiff asserts that he and Crum were able to perform jobs that other mechanics could not. (Pl.'s Counter 56.1 ¶ 29 (citing Crum Decl. ¶ 8).) Defendant denies this, stating that, as a mechanic's helper, Plaintiff performed the duties set forth in the CBA. (Def.'s Counter 56.1 ¶ 27 (citing Carpanini Decl. ¶ 60; Carpanini Decl. Ex. 2 (CBA) 76).) Defendant also denies that Plaintiff was able to perform tasks that other mechanics were unable to do, but does not provide any evidence to support that assertion. (Def.'s Counter 56.1 ¶ 29.) Finally, as evidence that his work performance was satisfactory, Plaintiff points to the performance review given by Garrett

on December 10, 2010 when Plaintiff was initially working as a mechanic's helper, stating that Plaintiff "meets the qualifications of his job and more." (*See* Pl.'s 56.1 ¶ 104 (citing Watkins Aff'n Ex. 1 (Performance Review)); *see also* Watkins Aff'n Ex. 1 (Performance Review).) However, the Court notes that Plaintiff was given also a less favorable review which stated he had "[l]imited potential due to not working well alone," but the review is unsigned and there is no evidence as to who wrote it, and the review is dated November 10, 2011, four months after the demotion. (*See* Def.'s 56.1 ¶ 113; Pl.'s 56.1 ¶ 113; Higgins Decl. Ex. B1, at unnumbered 34.)

Additionally, the day before Plaintiff was demoted, Schou wrote a note for McCall's personnel file stating that Plaintiff did not stay for overtime when he should have on July 8, 2011 and July 9, 2011. (Pl.'s Counter 56.1 ¶ 24; Def.'s Counter 56.1 ¶ 24; Higgins Decl. Ex. B1, at unnumbered 38.) However, on the evenings in question, Schou was not present at the plant, and Plaintiff tried to reach him by phone but was unable to do so. (Pl.'s Counter 56.1 ¶ 25; Def.'s Counter 56.1 ¶ 25.) According to Plaintiff, the supervisors at the plant told Plaintiff to leave at the end of his shift at midnight. (Pl.'s Counter 56.1 ¶ 26 (citing McCall Dep. Tr. 205–09; Watkins Aff'n Ex. 7 (McCall Timesheet) (reflecting that Plaintiff clocked out at 12:12 AM on July 8, 2011 and at 12:00 AM on July 9, 2011, after 8.2 and 8 hour work days, respectively)).) Defendant disputes this, pointing to the note by Schou and Plaintiff's deposition, although the Court notes that nothing in Plaintiff's deposition testimony supports Defendant's position. (*See* Def.'s Counter 56.1 ¶ 26 (citing McCall Dep. Tr. 205–09); McCall Dep. Tr. 205–09.)

### b. Racial Slurs and Jokes

The Parties also dispute whether Plaintiff's co-workers and supervisors used racial slurs. When he worked as a mechanic's helper, Plaintiff was assigned to work with mechanic Dave

11

Walker, (Pl.'s Counter 56.1 ¶ 4; Def.'s Counter 56.1 ¶ 4), though Defendant notes that Plaintiff

also worked with other mechanics, (Def.'s Counter 56.1 ¶ 4 (citing Carpanini Decl. ¶ 65)).

Plaintiff has testified that Walker "regularly referred to McCall as 'Boy,'" and also referred to

him as "Black Boy" and "told him to move his 'black ass.'"  (Pl.'s Counter 56.1 ¶ 5 (citing

McCall Decl. ¶ 6; McCall Dep. Tr. 235–36).)  Defendant denies this on the grounds that Plaintiff

never brought any such alleged name calling to the attention of Carpanini or Hager.  (Def.'s

Counter 56.1 ¶ 5 (citing McCall Dep. Tr. 236–37).)  The Parties also dispute whether Walker

made such overtly racist comments in the presence of Garrett.  (*Compare* Pl.'s Counter 56.1 ¶ 6

(citing McCall Decl. ¶ 6) *with* Def.'s Counter 56.1 ¶ 6 (citing Reply Decl. of Robert Garrett in

Further Supp. of Genpak's Mot. for Summ. J. ("Garrett Reply Decl.") ¶ 6 (Dkt. No. 43)).)

Plaintiff claims that, although he made it clear he did not appreciate Walker's comments, Garrett

took no action to intervene, (Pl.'s Counter 56.1 ¶ 7 (citing McCall Decl. ¶ 6)), although

Defendant denies that assertion, (Def.'s Counter 56.1 ¶ 7 (citing Garrett Reply Decl. ¶ 7)).

Plaintiff also has submitted evidence that other co-workers, in addition to Walker, regularly used

racial slurs and made racial jokes in Plaintiff's presence and outside of his presence.  (Pl.'s

Counter 56.1 ¶ 8 (citing McCall Decl. ¶ 7; Crum Decl. ¶ 4).)  Defendant denies this, citing

evidence that Garrett never heard racial slurs being directed at or about Plaintiff and evidence

that Plaintiff never complained to the corporate director of human resources about any such

occurrences, and that White, Garrett, Schou, and Carpanini never used racial slurs.  (Def.'s

Counter 56.1 ¶ 8 (citing Carpanini Decl. ¶¶ 35, 66–67; Garrett Reply Decl. ¶¶ 6–7); Carpanini

Decl. ¶¶ 35, 66–67; Garrett Reply Decl. ¶¶ 6–7.)[8]

---

[8] In turn, Carpanini's Declaration cites to portions of Plaintiff's deposition transcript
which support her Declaration.  (*See* Carpanini Decl. ¶¶ 66–67 (citing McCall Dep. Tr. 126–27,
252).)

Plaintiff also submitted evidence from his co-worker Tony Crum that co-workers and managers, including Schou, regularly referred to Plaintiff as a "nigger." (Pl.'s Counter 56.1 ¶¶ 10–11 (citing Crum Decl. ¶¶ 4, 10).) Defendant disputes this, based on the failure of Crum and McCall to report any such name calling to Carpanini or to any other manager, during their employment, and based on Plaintiff's deposition testimony that Schou never called Plaintiff a "nigger" or other racist names. (Def.'s Counter 56.1 ¶¶ 10–11 (citing McCall Dep. Tr. 126–27; Reply Decl. of Louisa Carpanini in Further Supp. of Genpak's Mot. for Summ. J. ("Carpanini Reply Decl.") ¶¶ 18–20, 23 (Dkt. No. 42)).) However, although there is no evidence that Schou used racist slurs in Plaintiff's presence, the evidence is that he did so behind Plaintiff's back. (*See* Crum Decl. ¶ 4.) Furthermore, Plaintiff claims that a senior mechanic, Darryl Decker, told Plaintiff that Decker's dog was named "Nigger," and referred to menial tasks Plaintiff was assigned to as "nigger work." (Pl.'s Counter 56.1 ¶¶ 12–13 (citing McCall Decl. ¶ 8).) Defendant disputes this, citing Garrett's declaration that he never heard Plaintiff called or referred to by any racist names. (Def.'s Counter 56.1 ¶¶ 12–13 (citing Garrett Reply Decl. ¶ 6); Garrett Reply Decl. ¶ 6.) Plaintiff claims that Walker threatened to fight Plaintiff and, when Plaintiff tried to walk away, Walker rammed into him, causing Plaintiff's lip to bleed. (Pl.'s Counter 56.1 ¶ 14 (citing McCall Decl. ¶ 9).) Plaintiff explained to management what occurred with respect to the physical altercation, but they accepted Walker's story that it was an accident and allowed him to apologize, rather than taking any disciplinary action against him. (*Id.* ¶ 15 (citing McCall Decl. ¶ 9).) Defendant disputes this, pointing to evidence that some disciplinary action was taken, namely a final letter being placed in Walker's file and him being required to go to anger management. (Def.'s Counter 56.1 ¶ 15 (citing McCall Dep. Tr. 243–47; Carpanini Decl. ¶ 33; Carpanini Reply Decl. ¶ 35); Carpanini Decl. ¶ 33.)

13

Finally, it is not in dispute that between the time that Hager interviewed Plaintiff for the job in September 2010 and the time of his demotion back to a mechanic's helper position on or about July 12, 2011, Hager never said anything to Plaintiff about his race or color, and never called Plaintiff any inappropriate names related to his race or color.   (Def.'s 56.1 ¶ 119; Pl.'s 56.1 ¶ 119.)  However, that is where the agreement ends.  After his July 12, 2011 demotion and several months before his termination, in or about November 2011, according to Plaintiff, Hager saw Plaintiff wearing a bandana on his head while he was working, and she called him "Aunt Jemima."  (Def.'s 56.1 ¶ 120; Pl.'s 56.1 ¶ 120; Pl.'s Counter 56.1 ¶¶ 31–32 (citing McCall Decl. ¶¶ 14–15; Crum Decl. ¶ 5).)  During Defendant's investigation into Plaintiff's EEOC charge he made prior to commencing the instant suit, Carpanini interviewed Hager, and Hager denied that she made this comment, but Defendant has not offered a sworn statement from Hager in opposition to the instant Motion.  (*See* Def.'s 56.1 ¶ 120; Pl.'s 56.1 ¶ 120.)[9]  The Parties dispute whether Plaintiff reported this comment, with Plaintiff claiming that he reported the comment to Steve Derisi, a manager in the engineering department, who told him to tell human resources and to get a lawyer, (Pl.'s Counter 56.1 ¶¶ 34–35 (citing McCall Decl. ¶ 15)), and then to Carpanini, (Pl.'s 56.1 ¶ 121 (citing McCall Decl. ¶¶ 14–16); McCall Decl. ¶¶ 14–16).  According to Plaintiff, Carpanini told McCall she would file a report with her boss, but Plaintiff never heard

---

[9] In support of its position, Defendant cites sworn statements from Carpanini and McCall, as well as "Defendant's Discovery Responses, Ex. F."  (*See* Def.'s 56.1 ¶ 120 (citing, inter alia, Carpanini Decl. ¶ 75; McCall Dep. Tr. 192–93).  While it is not entirely clear whether Defendant intended to cite a different document, the Court notes that Exhibit F to Defendant's discovery responses appears to relate to Plaintiff's dispute with Walker, not Hager.  (*See* Def.'s 56.1 ¶ 43 (defining "Defendant's Discovery Responses" as "Defendant's Response to Plaintiff[']s First Set of Document Demands, dated April 15, 2014"); Higgins Decl. Ex. F (April 15, 2014 Letter from John E. Higgins enclosing Defendant's Responses to Plaintiff's First Set of Document Demands) Ex. F.)

back from her about his complaint.  (Pl.'s Counter 56.1 ¶¶ 37–38 (citing McCall Decl. ¶ 16).)

Defendant, in turn, disputes this, citing to Carpanini's testimony that Plaintiff never reported any

of this to her.  (Def.'s 56.1 ¶¶ 73–75; Def.'s Counter 56.1 ¶ 36–38 (citing Carpanini Decl. ¶¶ 31–

32; Carpanini Decl. ¶¶ 73–75.)[10]

Furthermore, according to Plaintiff, Hager was hostile toward him throughout his

employment and treated him worse than she treated his white co-workers.  (Pl.'s Counter 56.1

¶ 30 (citing McCall Decl. ¶ 15; Crum Decl. ¶ 10).)  Defendant disputes this, but only cites to

Hager's hearsay statement to Carpanini during Carpanini's investigation into the allegations in

Plaintiff's EEOC charge.  (Def.'s Counter 56.1 ¶ 30 (citing Carpanini Decl. Ex. 5, at 1–2).)

Plaintiff also points to an incident in December 2011:  According to Plaintiff, during preparation

for a plant inspection, Hager yelled at Plaintiff because he had an empty potato chip bag in his

toolbox and she screamed in his face that she would fire him if he caused the plant to fail

inspection.  (Pl.'s Counter 56.1 ¶¶ 39–40 (citing McCall Decl. ¶ 17).)  However, according to

Plaintiff, when Hager saw that a white co-worker's toolbox was a mess, she calmly asked him to

clean it and neither yelled at him nor threatened to fire him.  (Pl.'s Counter 56.1 ¶ 41 (citing

McCall Decl. ¶ 17).)  Defendant disputes that this incident occurred as Plaintiff asserts, citing to

the investigation into the EEOC charge, which included a hearsay statement from Hager that the

chip bag would have caused the plant to lose points on the inspection but that the white co-

worker had a picture in his toolbox that would not have caused points to be taken away.  (Def.'s

Counter 56.1 ¶¶ 39–41 (citing Carpanini Decl. Ex. 5 (EEOC Investigation) 2); Carpanini Decl.

Ex. 5 (EEOC Investigation) 2.)

---

[10] Defendant also points to evidence that Carpanini promptly investigated other racial
harassment claims and Plaintiff's claim regarding Walker barreling into him.  (Def.'s 56.1 ¶ 74.)

Plaintiff asserts that he found the above comments offensive.  For example, Plaintiff proffers evidence that he made it clear he did not appreciate Walker's comments, (Pl.'s Counter 56.1 ¶¶ 6–7 (citing McCall Decl. ¶ 6)), that Plaintiff found it "very offensive" when Decker told Plaintiff that Decker's dog was named "Nigger," (*id.* ¶ 12 (citing McCall Decl. ¶ 8)), and that Plaintiff was offended by Hager referring to him as "Aunt Jemima," (*id.* ¶¶ 32–33 (citing McCall Decl. ¶ 15; Crum Decl. ¶ 5)).  Plaintiff claims that in the spring or early summer of 2011, Plaintiff complained to Schou about racial harassment by co-workers, including by Decker and Walker.  (Pl.'s Counter 56.1 ¶ 16 (citing McCall Decl. ¶ 10).)  According to Plaintiff, after he complained to Schou, Schou did not take remedial action but merely started to treat Plaintiff worse than he did previously.  (Pl.'s Counter 56.1 ¶ 18 (citing McCall Decl. ¶ 10; Crum Decl. ¶ 7 (declaring that Plaintiff and Crum were "regularly assigned the worst, most dangerous jobs")).)  Defendant disputes this, citing the notes from Cathi Sawchuk's investigation into Plaintiff's claims in his EEOC charge and her discussion with Schou, which reflected that Plaintiff had not complained to Schou about racial harassment.  (Def.'s Counter 56.1 ¶ 16 (citing Carpanini Decl. Ex. 5 (EEOC investigation)); Carpanini Decl. Ex. 5 (EEOC Investigation) unnumbered 3–4; *see also* Def.'s 56.1 ¶ 77 (citing Carpanini Decl. ¶ 34 n.6) (noting that Schou denied the alleged actions or inactions attributed to him).)

Plaintiff also claims that he spoke to his union representative, Leigh Miller, about the racial harassment, and that Miller "told him 'not to rock the boat' and that he did not want to hear about it from [P]laintiff."  (Pl.'s Counter 56.1 ¶ 17 (citing McCall Decl. ¶ 11).)[11]  Defendant disputes this, citing Plaintiff's admission that he did not file a contract grievance pursuant to the

---

[11] Plaintiff cited Paragraph 10 of his Declaration, but this appears to have been an error. (*See* McCall Decl. ¶ 11.)

procedure in the CBA.  (Def.'s Counter 56.1 ¶ 18 (citing Att'y's Reply Decl. of John E. Higgins

in Further Supp. of Def.'s Mot. for Summ. J. ("Higgins Reply Decl.") ¶ 5(b) (Dkt. No. 41));

Higgins Reply Decl. ¶ 5(b) (citing Pl.'s 56.1 ¶ 60).)  Finally, it is undisputed that Plaintiff never

contacted Cathi Sawchuk, the Corporate Director of Human Resources, to whom Carpanini

reports, to complain about any racial discrimination, harassment, or retaliation.  (Def.'s 56.1

¶ 78; Pl.'s 56.1 ¶ 78.)

<u>c.  Plaintiff's Termination</u>

On March 2, 2012, Hager terminated Plaintiff's employment.  (Def.'s 56.1 ¶¶ 127, 129;

Pl.'s 56.1 ¶¶ 127, 129.)  The reason Hager gave for terminating Plaintiff was that he had

accumulated twenty-four absence points.  (Def.'s 56.1 ¶¶ 129–30; Pl.'s 56.1 ¶¶ 129–30.)

Prior to being terminated, Plaintiff accrued a number of points pursuant to the No Fault

Absentee Policy.  As explained at oral argument, supervisors completed absence reports

describing the "occurrence" under the Policy and whether the absence, tardiness, or early

departure was excused, and then sent the reports to human resources.  It appears that Schou and

Garrett signed several of McCall's absence reports.  (*See* Carpanini Decl. Ex. 10; Carpanini

Reply Decl. Ex. E.)  According to Defendant, Plaintiff was correctly given three points for

coming in late on February 18, 19, and 20, 2012, leading to his termination.  (Pl.'s Counter 56.1

¶ 56; Def.'s Counter 56.1 ¶ 56.)  However, there is an issue of fact as to whether Plaintiff should

have been marked as late on those days:  Plaintiff claims that, based on the time that his

supervisor, Schou, told him to arrive, he clocked in early or on time because he was expected to

work late on those days.  (Pl.'s Counter 56.1 ¶¶ 56–57 (citing Carpanini Decl. ¶ 80; McCall

Decl. ¶ 19).)  Plaintiff declared that he worked from 11:26 AM until 12:06 AM on February 18,

2012, from 9:30 AM until 5:40 PM on February 19, 2012,[12] and from 9:59 AM until 6:04 PM on February 20, 2012.  (McCall Decl. ¶ 19.)  Plaintiff further declared that he reported for work at the time he was told to by Schou.  (*Id.*)  Defendant disputes this, putting forth evidence that McCall's start time was 8:00 AM.  (Def.'s Counter 56.1 ¶ 57 (citing Carpanini Reply Decl. ¶¶ 45–46); Carpanini Reply Decl. ¶¶ 45–46.)[13]

On March 1, 2012, Carpanini determined during her review of Plaintiff's time and attendance for the preceding four-week block of time that he had accumulated twenty-four points as of February 20, 2012.  (Def.'s 56.1 ¶ 126 (citing Carpanini Decl. ¶ 81).)  Plaintiff disputes whether his points were calculated correctly, claiming that, as of February 20, 2012, he had, at most, fifteen points, (Watkins Aff'n ¶ 3); however, he does not dispute that Carpanini was responsible for this calculation, (*see* Pl.'s 56.1 ¶ 126).  Leigh Miller, the Chief Union Shop Steward counted up Plaintiff's points and agreed with Carpanini's calculation.  (Def.'s 56.1 ¶ 126 (citing Carpanini Decl. ¶ 81).)  The next day, on March 2, 2012, Hager determined that, in accordance with Genpak's policy, Plaintiff's employment had to be terminated.  (Def.'s 56.1 ¶ 127 (citing Carpanini Decl. ¶ 82; Carpanini Decl. Exs. 12–13); Pl.'s 56.1 ¶ 127.)  The Court notes that Plaintiff received several warnings before termination:  In particular, Plaintiff received a verbal warning on or about January 20, 2011, upon accumulating six points, a written warning on June 5, 2011 for accumulating twelve points, and a final written warning on December 21, 2011 for accumulating 16 points.  (*See* Def.'s 56.1 ¶ 94; Pl.'s 56.1 ¶ 94.)

---

[12] Plaintiff actually declared he worked "from 9:30 a.m. until 5:40 a.m., or just over 8 hours," but the second "AM" appears to be a typographical error.  (McCall Decl. ¶ 19.)

[13] Defendant also cites to pages 52–53 of Exhibit 2 to the Carpanini Declaration, but those pages do not appear in the record.  (Def.'s Counter 56.1 ¶ 57.)

Defendant has provided evidence that other white employees were terminated around the same time for accumulating twenty-four or more points.  In particular, Patrick Crowe, Jr. was terminated on January 24, 2012 because he had accumulated twenty-five points; Christina Barber was terminated on May 25, 2012 because she had accumulated twenty-seven points; Victoria Carpenter was terminated on November 16, 2012 because she had accumulated twenty-four points; and John Morgan was terminated on October 22, 2013 because he had accumulated twenty-four points.  (Def.'s 56.1 ¶ 131 (citing Carpanini Decl. ¶ 86).)  Plaintiff disputes this, noting that two of the white employees had been permitted to accumulate more than twenty-four points before termination.  (Pl.'s 56.1 ¶ 131.)  However, there is no evidence regarding the details of those other employees' point calculations, and the evidence set forth by Defendant, and not disputed by Plaintiff, demonstrates that Carpanini calculated the point totals at the end of each four-week block of time, (*see* Def.'s 56.1 ¶ 54 (citing Carpanini Decl. ¶ 15); Pl.'s 56.1 ¶ 54), which could also account for an employee being allowed to exceed twenty-four points prior to termination.

Finally, the evidence shows that Carpanini, who determined that Plaintiff had accrued twenty-four points, had never made any discriminatory remarks about Plaintiff (or any employee).  (Def.'s 56.1 ¶ 111; Pl.'s 56.1 ¶ 111 (not disputing that portion of Defendant's assertion); *see also* McCall Dep. Tr. 127 (admitting that Carpanini never called Plaintiff any racist names).)

B.  Procedural Background

Plaintiff filed the Complaint on March 22, 2013.  (Dkt. No. 1.)  Defendant answered on April 16, 2013.  (Dkt. No. 3.)  On November 19, 2013, the Court set a discovery and case management schedule.  (*See* Dkt. (minute entry for Nov. 19, 2013); *see also* Dkt. No. 10.)

Defendant submitted a pre-motion letter, (Dkt. No. 11), to which Plaintiff responded, (Dkt. No. 12), and the Court held a pre-motion conference on July 28, 2014, (Dkt. (minute entry for July 28, 2014)).  Pursuant to a schedule set by the Court, (Dkt. No. 14), as extended by the Court upon request, (Dkt. Nos. 28, 40), the following papers were filed.  Defendant filed its Motion for Summary Judgment and accompanying papers on September 29, 2014.  (Dkt. Nos. 15–18.)  Due to a filing error, Defendant re-filed these documents.  (Dkt Nos. 21–23, 25.)  On November 3, 2014, with the permission of the Court, (Dkt. No. 31), Defendant filed an updated declaration from Carpanini and 56.1 Statement to correct typos, (Dkt Nos. 32–33).  Plaintiff then filed his opposition on November 3, 2014.  (Dkt. Nos. 34–38.)  Defendant filed its reply papers on November 21, 2014.  (Dkt. Nos. 41–45.)  The Court held oral argument on July 28, 2015.  (Dkt. (minute entry for July 28, 2015).)

## II.  Discussion

### A.  Applicable Law

#### 1.  Standard of Review

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute

exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also*

*Aurora Commercial Corp. v. Approved Funding Corp.,* No. 13-CV-230, 2014 WL 1386633, at

*2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go

to the trier of fact on an essential element of the nonmovant's claim," in which case "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse*

*Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to

create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to

'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty.*

*of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or

denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL

1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia,

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is

properly supported by documents or other evidentiary materials, the party opposing summary

judgment may not merely rest on the allegations or denials of his pleading . . . .")).

    "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  *Brod,* 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No.

1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's

goal should be "'to isolate and dispose of factually unsupported claims.'"  *Geneva Pharm. Tech.*

*Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 323–24 (1986)).

### 2.  Framework for Discrimination Claims

#### a.  Title VII, NYSHRL, and § 1981

Plaintiff brings claims alleging that he was subjected to discriminatory demotion and

termination, retaliation, and a hostile work environment on account of his race/color, in violation

of Title VII, the NYSHRL, and 42 U.S.C. § 1981.  With respect to the first set of claims, the law

provides the following:

> Title VII prohibits "discriminat[ion] against any individual with respect to his
> compensation, terms, conditions, or privileges of employment," § 2000e–2(a)(1),
> the NYSHRL similarly prohibits employers from "discriminat[ing] against such
> individual in compensation or in terms, conditions or privileges of employment,"
> N.Y. Exec. Law § 296(1)(a), and § 1981 provides that all "persons . . . shall have
> the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens,"
> § 1981(a). Refusing to award a contract or a material employment benefit for a
> discriminatory reason violates those statutes.

*Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) (alterations in original).

With respect to retaliation, Title VII prohibits discrimination against an employee

"because he [or she] has opposed any practice made an unlawful employment practice."  42

U.S.C. § 2000e-3(a).  The NYSHRL similarly prohibits an employer from "discharg[ing] or

otherwise discriminat[ing] against any person because he or she has opposed any practices

forbidden under [§ 296]."  *See* N.Y. Exec. Law § 296(3-a)(c).  Additionally, the Supreme Court

has held that § 1981 "prohibits not only racial discrimination but also retaliation against those

who oppose it."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013).

Finally, "Title VII prohibits the creation of a hostile work environment based on race, color, religion, sex, or national origin." *Daniel v. T & M Prot. Res. LLC*, — F. Supp. 3d —, 2015 WL 728175, at *9 (S.D.N.Y. Feb. 19, 2015) (internal quotation marks omitted), *appeal dismissed* (Apr. 30, 2015). "Section 1981 [also] provides a cause of action for race-based employment discrimination based on a hostile work environment," *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000), as does the NYSHRL, *see Massie v. Metro. Museum of Art*, No. 11-CV-9549, 2015 WL 3833839, at *6 (S.D.N.Y. June 22, 2015) (holding that Title VII, NYSHRL, and § 1981 hostile work environment claims are analyzed the same way).

### b. *McDonnell Douglas* Framework

Courts analyze claims for adverse employment actions and retaliation under Title VII, the NYSHRL, and § 1981 under the familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (Title VII claim); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."); *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) ("[The plaintiff's] Title VII claims and his claims for race . . . discrimination under Section[] 1981 . . . are analyzed under the burden-shifting framework set forth in [*McDonnell Douglas*]."); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216–17 (2d Cir. 2005) (NYSHRL); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013) ("Racial discrimination claims brought pursuant to Title VII, Section 1981, and the NYSHRL are governed at the summary judgment stage by the burden-shifting analysis established for Title VII claims in [*McDonnell Douglas*]."), *aff'd*, 586 F. App'x 739 (2d Cir. 2014). "Under *McDonnell*

*Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination . . . ." *Abrams*, 764 F.3d at 251.  Afterwards, "it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions . . . ." *Id.* Lastly, "the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."  *Id.*  "The employee at all times bears the burden of persuasion to show a retaliatory motive."  *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

  B.  Analysis

    1.  Direct Evidence of Discrimination

Plaintiff argues that he has proffered direct evidence of discrimination, and thus the *McDonnell Douglas* framework does not apply.  (*See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 15–17 (Dkt. No. 34).)  The Court disagrees because Plaintiff has *not* provided any direct evidence of discrimination, either with respect to his claim for demotion or for termination.  "The Second Circuit has noted that 'direct evidence' would roughly equate to a 'smoking gun' indicating that a plaintiff's firing was discriminatory."  *Manon v. 878 Educ., LLC*, No. 13-CV-3476, 2015 WL 997725, at *3 (S.D.N.Y. Mar. 4, 2015) (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).  There is direct evidence where, for example, a company's policy related to an adverse employment action explicitly relies on a protected characteristic.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121–22 (1985) (noting that the defendant's argument that the plaintiff did not establish prima facie case under *McDonnell Douglas* must fail where the plaintiff presented direct evidence of discrimination in that the company policy provided that the employment action depended on the employees' ages).  Similarly, there is

direct evidence where the decisionmaker made comments evincing a discriminatory mindset when terminating a plaintiff's employment. *See Manon*, 2015 WL 997725, at *3 (holding that there was direct evidence of discrimination sufficient to go to a jury where, during the formal meeting terminating the plaintiff's employment, the plaintiff's direct supervisor remarked that he "needed someone without children to work at the front desk," and asked, "How can you guarantee me that [] two weeks from now your daughter is not going to be sick again? . . . So, what is it, your job or your daughter?"); *see also Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459, 463 (S.D.N.Y. 1998) (holding that comments reflecting a discriminatory animus made in connection with a criticism of the plaintiff's work skills during the time period immediately prior to the plaintiff's discharge were direct evidence of discrimination). Although Plaintiff proffers circumstantial evidence from which a jury may be able to conclude that adverse employment actions were taken for discriminatory purposes, the comments here were, in large part, not made by decisionmakers, were not made in the context of evaluating Plaintiff's work, and were not made in close temporal proximity to the decisions, and thus do not provide direct evidence that the demotion and termination were discriminatory. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432–33 (7th Cir. 2005) (noting that direct evidence "is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII," and holding that there was not direct evidence of discrimination where an employee was told his salary was lower because he was Brazilian because the statement was not made by the decisionmaker (internal quotation marks omitted)); *Renz v. Grey Advert., Inc.*, 135 F.3d 217, 224 (2d Cir. 1997) (finding that employee was laid off for non-discriminatory reasons despite "isolated remarks . . . commenting critically on the ages of several female employees" ); *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 153–55 (E.D.N.Y. 2013) (holding

that, even if evidence of statements by the decisionmaker about other women and minorities such as "that black bitch," "a dumb nigger," and "a fat ugly cunt" were admissible, they still would not constitute direct evidence because they were not "probative of the defendants' motive for taking action against [the plaintiff]"), *aff'd*, 576 F. App'x 39 (2d Cir. 2014); *Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 371, 385 (E.D.N.Y. 2012) (noting that "'[d]irect evidence' is 'evidence tending to show, *without resort to inference,* the existence of a fact in question'" (emphasis in original) (quoting *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1183 (2d Cir. 1992))); *Dixon v. Int'l Fed'n of Accountants*, No. 09-CV-2839, 2010 WL 1424007, at *3–4 (S.D.N.Y. Apr. 9, 2010) (holding that a comment by a co-worker that she "[couldn't] believe that [the defendant] could hire a black Jamaican woman at 48 years of age" was not direct evidence of discrimination), *aff'd*, 416 F. App'x 107 (2d Cir. 2011); *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 884 F. Supp. 112, 115–16 (S.D.N.Y. 1995) (holding that a statement made by someone not involved in the adverse employment action could not be direct evidence of discrimination), *aff'd*, 82 F.3d 16 (2d Cir. 1996).

### 2.  Demotion

#### a.  Prima Facie Case

To satisfy his burden of establishing a prima facie case of discrimination, Plaintiff must produce evidence that shows that: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  "Although the burden of meeting the prima facie case is 'de minimis,' Plaintiff must adduce some admissible evidence that would support [his] claims." *Hill v. Rayboy–Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006).

First, it is undisputed that Plaintiff belongs to a protected class.  (Pl.'s Counter 56.1 ¶ 1; Def.'s Counter 56.1 ¶ 1.)  Additionally, Plaintiff was demoted, which is clearly an adverse employment action.  *See, e.g.*, *Petyan v. N.Y.C. Law Dep't*, No. 14-CV-1434, 2015 WL 4104841, at *3 n.8 (S.D.N.Y. July 2, 2015) ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (alteration in original) (internal quotation marks omitted) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004))).  Defendant disputes that Plaintiff has met the second and fourth elements of a prima facie case, that he was qualified for his job as a mechanic trainee and that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  (*See* Mem. of Law in Supp. of Genpak's Mot. for Summ. J. ("Def.'s Mem.") 13 (Dkt. No. 17).)  Each element will be addressed in turn.

With respect to the second element of the prima facie case, Plaintiff has proffered evidence that he was qualified for the position as a mechanic trainee.  In particular, Plaintiff claims that, after his demotion, he continued to perform the same work he had as a mechanic trainee.  (Pl.'s Counter 56.1 ¶ 27 (citing McCall Decl. ¶ 13; Crum Decl. ¶ 8).)  He further asserts that he was able to perform jobs that other mechanics could not.  (Pl.'s Counter 56.1 ¶ 29 (citing Crum Decl. ¶ 8).)  Finally, Plaintiff points to the fact that the only performance review he was given prior to the demotion was satisfactory; the review, given by Garrett in December 10, 2010 when Plaintiff was initially working as a mechanic's helper, stated that Plaintiff "meets the qualifications of his job and more." (Pl.'s 56.1 ¶ 104 (citing Watkins Aff'n Ex. 1 (Performance Review); Watkins Aff'n Ex. 1

(Performance Review).)[14]  Defendant proffers some evidence disputing this.  Namely, Defendant asserts that, as a mechanic's helper, Plaintiff only performed the duties set forth in the CBA, and nothing more.  (*See* Def.'s Counter 56.1 ¶ 28 (citing Carpanini Decl. ¶ 60; Carpanini Decl. Ex. 2 (CBA) 76).)  Defendant also generally denies that Plaintiff was able to perform tasks that other mechanics were unable to do, but does not provide any support for that assertion.  (*See* Def.'s Counter 56.1 ¶ 29.)  In its Memorandum of Law in Support of its Motion, though, Defendant relies not on this evidence, but on evidence in the record it did not cite in its Rule 56.1 Statement.  Specifically, Defendant asserts that "it is undisputed that plaintiff was required in his position as a Shift Mechanic Trainee to 'be familiar with all facets and procedures of plant operations' and 'capable of diagnosing and repairing plant equipment entirely on his own, without supervision,'" (Def.'s Mem. 13–14 (quoting Carpanini Decl. Ex. 2 (CBA) 72)), and that "in his position as a Helper in the Maintenance Department, [P]laintiff was required to 'show traits of mechanical abilities and potential of moving up' and 'should be able to assist fellow maintenance personnel on assigned jobs,'" (*id.* at 14 (quoting Carpanini Decl. Ex. 2 (CBA) 76–77)), but that "[a]t the time of plaintiff's *termination* on March 2, 2012 . . . [P]laintiff was found by Ms. Hag[e]r to have unsatisfactory judgment, initiative, creativity, independence, reliability, and attendance for his Helper position," (*id.* (emphasis added)).

---

[14] As noted, Plaintiff also received a more negative review assessing his mechanic skills. However, this review is unsigned and there is no evidence as to who wrote it, and the review is dated November 10, 2011, four months after the demotion.  (*See* Higgins Decl. Ex. B1, at unnumbered 34; Def.'s 56.1 ¶ 113; Pl.'s 56.1 ¶ 113.)  Defendant does not cite this review in its Rule 56.1 Statement or address it in its Memorandum of Law or Reply.

First, Defendant cites no evidence that Plaintiff was found to not meet the requirements of a shift mechanic trainee.  Second, Defendant cites to evidence not referenced in its Rule 56.1 statement, but the Second Circuit has been clear that a district court "is not required to consider what the parties fail to point out in their Local Rule 56.1 statements." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted); *see also Watt v. N.Y. Botanical Garden*, No. 98-CV-1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000) ("In setting forth the evidence in this [o]pinion, the [c]ourt could have properly relied only on the parties' Rule 56.1 [s]tatements and the citations to the record contained in those [s]tatements.").  Thus, the Court need not consider any evidence not included in the Rule 56.1 Statements.  Third, even considering the evidence cited by Defendant, at most what Defendant has provided is a dispute over a material fact, with Plaintiff proffering evidence that he was qualified for his position and Defendant proffering evidence that he was not.  But in deciding a motion for summary judgment, the Court's job is not to credit the movant's evidence over that of the non-movant; rather, as noted above, a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod*, 653 F.3d at 164 (internal quotation marks omitted).  Fourth, and finally, the "general rule is that an employee 'only needs to demonstrate that she possesses the basic skills necessary for performance of the job.'" *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 338 (S.D.N.Y. 2001) (quoting *Owens v. N.Y.C. Hous. Auth.,* 934 F.2d 405, 409 (2d Cir. 1991)).  Plaintiff has set forth sufficient evidence for such a finding.  Thus, the Court finds that Plaintiff has sufficiently proffered evidence to meet the second element of his prima facie case.

Finally, the Court must consider whether the demotion occurred under circumstances giving rise to an inference of discrimination. The Second Circuit has not created an "unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). A plaintiff may satisfy this element of the prima facie case by showing evidence of discriminatory animus, such as "remarks made by decisionmakers that could be viewed as reflecting [such] animus." *See id.* Alternatively, "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000))). Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent; rather, Plaintiff "must point to facts that suggest" that the adverse action was motivated, at least in part, by discriminatory animus. *See Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *see also Anderson v. Port Auth. of N.Y. & N.J.*, No. 04-CV-4331, 2009 WL 102211, at *4 (S.D.N.Y. Jan. 12, 2009) ("[M]ere conclusory allegations of discrimination will not defeat a summary judgment motion; a plaintiff in a discrimination case must proffer 'concrete particulars' to substantiate his claim."); *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 398–99 (S.D.N.Y. 2008) (noting that "no evidence support[ed] any finding of discriminatory animus" with respect to the plaintiff's Title VII race discrimination claim).

30

Here, the evidence shows that Hager made the decision to demote Plaintiff, (Def.'s 56.1 ¶ 117; Pl.'s 56.1 ¶ 117), partially on the advice of Walker and Plaintiff's supervisors, (*see* Def.'s 56.1 ¶ 115; Pl.'s 56.1 ¶ 115; Pl.'s Counter 56.1 ¶ 22).  With respect to Hager, Plaintiff proffers evidence that, after he was demoted, in November 2011, Hager saw Plaintiff wearing a bandana on his head while he was working, and she called him "Aunt Jemima."  (Def.'s 56.1 ¶ 120; Pl.'s 56.1 ¶ 120; Pl.'s Counter 56.1 ¶¶ 31–32 (citing McCall Decl. ¶¶ 14–15; Crum Decl. ¶ 5).) Plaintiff also claims that Hager told him that Walker told her that Plaintiff had been spoken to and given several chances, but that he lacked the ability to be a mechanic.  (Pl.'s Counter 56.1 ¶ 22 (citing McCall Dep. Tr. 198–99).)  Defendant denies this, but nothing in the materials cited provides evidence that contradicts this.  (*See* Def.'s Counter 56.1 ¶ 22 (citing Def.'s 56.1 ¶¶ 112–16; Carpanini Decl. ¶¶ 68–72); Def.'s 56.1 ¶¶ 112–16; Carpanini Decl. ¶¶ 68–72.)  With respect to Walker, Plaintiff submitted evidence that Walker "regularly referred to [Plaintiff] as 'Boy,'" and also referred to him as "Black Boy" and "told him to move his 'black ass.'"  (Pl.'s Counter 56.1 ¶ 5 (citing McCall Decl. ¶ 6; McCall Dep. Tr. 235–36).)  Hager also told Plaintiff that supervisors did not think that he was capable of doing the job.  (Pl.'s Counter 56.1 ¶ 23; Def.'s Counter 56.1 ¶ 23.)  Plaintiff's initial supervisor was Garrett, and Plaintiff was later supervised by Schou, though it is unclear when he started being supervised by Schou.  (*See* Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 102.)  With respect to Garrett, Plaintiff claims that Walker made overtly racist comments in front of Garrett, and Garrett took no action to intervene.  (Pl.'s Counter 56.1 ¶¶ 6–7 (citing McCall Decl. ¶ 6).)  And, with respect to Schou, Plaintiff proffers evidence that Schou referred to Plaintiff as a "nigger" on multiple occasions.  (Pl.'s Counter 56.1 ¶ 11 (citing Crum Decl. ¶ 4).)  Not surprisingly, Defendant disputes all of this evidence.  (*See* Def.'s Counter 56.1 ¶¶ 6, 7, 11.)

Crediting Plaintiff's evidence, Plaintiff has submitted sufficient evidence to raise an inference of discrimination based on the remarks of Hager and Walker.

> In determining whether a remark is probative [of discriminatory intent], [courts in the Second Circuit] have considered four factors: (1) who made the remark (*i.e.,* a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.,* whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.,* whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 149 (2d Cir. 2010).  With respect to Hager's "Aunt Jemima" comment, this comment was made by the decisionmaker.  Furthermore, a reasonable juror could view the remark as discriminatory.  *See Wesley-Dickson*, 973 F. Supp. 2d at 399 (holding that a reasonable juror could find that a comment that the plaintiff sounded "just like Aunt Jemima and sounded like she was down on the plantation" was racially discriminatory (alterations and internal quotation marks omitted)).  According to Plaintiff, this remark was made in November 2011, only four months after his July 12, 2011 demotion and several months before his termination in March 2012.  (*See* Def.'s 56.1 ¶¶ 120, 127, 129; Pl.'s 56.1 ¶¶ 120, 127, 129; Pl.'s Counter 56.1 ¶¶ 31–32 (citing McCall Decl. ¶¶ 14–15; Crum Decl. ¶ 5).)  Furthermore, Plaintiff provides evidence of discriminatory comments by Walker, in particular that Walker "regularly referred to McCall as 'Boy,'" and also referred to him as "Black Boy" and "told him to move his 'black ass.'"  (*See* Pl.'s Counter 56.1 ¶ 5 (citing McCall Decl. ¶ 6; McCall Dep. Tr. 235–36).)  Plaintiff also notes that Walker was involved in the decisionmaking process, in that he advised Hager that Plaintiff was not performing adequately.

Additionally, "[t]o raise an inference of discrimination by relying on differential treatment of similarly-situated individuals, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's

cases, such that the comparator must be similarly situated to the plaintiff in all material respects."
*Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 311 (E.D.N.Y. 2014) (alteration and
internal quotation marks omitted), *aff'd*, 594 F. App'x 29 (2d Cir. 2015). "The two positions
need not be identical but they must be sufficiently similar to support at least a minimal inference
that the difference in treatment may be attributable to discrimination." *Id.* (internal quotation
marks omitted); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here
a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate
treatment of other employees, those employees must have a situation sufficiently similar to
plaintiff's to support at least a minimal inference that the difference of treatment may be
attributable to discrimination."); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 579–
80 (S.D.N.Y. 2013) (noting that, "[w]hen a plaintiff seeks to meet her prima face case by
reference to the disparate treatment of an allegedly similarly situated employee," "such employee
must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that
the difference of treatment may be attributable to discrimination." (internal quotation marks
omitted)).

Plaintiff provides some evidence that he was treated differently than similarly situated
white employees. According to Plaintiff, Hager was hostile toward him throughout his
employment and treated him worse than his white co-workers. (Pl.'s Counter 56.1 ¶ 30 (citing
McCall Decl. ¶ 15; Crum Decl. ¶ 10).) Plaintiff points specifically to an incident in December
2011. According to Plaintiff, during preparation for a plant inspection, Hager yelled at Plaintiff
because he had an empty potato chip bag in his toolbox, and she screamed in his face that she
would fire him if he caused the plant to fail inspection. (Pl.'s Counter 56.1 ¶¶ 39–40 (citing
McCall Decl. ¶ 17).) However, according to Plaintiff, when Hager saw that a white co-worker's

toolbox was a mess, she calmly asked him to clean it and neither yelled at him nor threatened to fire him.  (Pl.'s Counter 56.1 ¶ 41 (citing McCall Decl. ¶ 17).)  Finally, Plaintiff proffers evidence that Plaintiff and Crum, because he worked with Plaintiff, were "regularly assigned the worst, most dangerous jobs."  (*See* Pl.'s Counter 56.1 ¶ 17 (citing Crum Decl. ¶ 7); Crum Decl. ¶¶ 7, 10.)  Although Defendant disputes this evidence and, with respect to the inspection incident, provides evidence that the individuals involved may not have been similarly situated, (*see* Def.'s Counter 56.1 ¶¶ 17, 39–41, Carpanini Decl. Ex. 5 (EEOC Investigation) 2), Plaintiff provides enough evidence of differential treatment by Hager and work-assigning supervisors, when combined with the racially derogatory comments discussed above, to raise an inference of discrimination.

In its defense, Defendant relies on the same-actor inference, arguing that the fact that Hager was the same person who hired Plaintiff, demoted him, and fired him, and that she did so in a short time period, undercuts any possible inference of discrimination.  (Def.'s Mem. 14–15.) However, the same-actor inference is only a *plausible* inference, not a necessary one.  *See, e.g.*, *O'Diah v. Yogo Oasis*, 954 F. Supp. 2d 261, 274 (S.D.N.Y. 2013) ("Although a nondiscriminatory inference may be drawn when an employee is hired and fired by the same decisionmaker, the same-actor inference is permissive, not mandatory." (citation and internal quotation marks omitted)); *Masters v. F.W. Webb Co.*, No. 03-CV-6280, 2008 WL 4181724, at *6 (W.D.N.Y. Sept. 8, 2008) ("[T]he inference alone is generally not a sufficient basis to grant summary judgment for the employer, at least when the employee has proffered evidence of pretext."); *Sklaver v. Casso-Solar Corp.*, No. 02-CV-9928, 2004 WL 1381264, at *10 n.16 (S.D.N.Y. May 15, 2004) ("[The same-actor] inference is not mandatory, and therefore does not necessarily carry the day on defendant's motion for summary judgment.").

On balance, the Court finds that Plaintiff has provided sufficient evidence to make out a prima facie case.  In so deciding, the Court relies on the Second Circuit's recent decision in *Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015), which emphasized that "[e]mployers are unlikely to leave a smoking gun admitting a discriminatory motive," and indeed, "[s]uch evidence is not required to make a prima facie case of discrimination."  *See id.* at 438 (internal quotation marks omitted).  Rather, "[s]tatements showing an employer's racial bias, which [the plaintiff] identified, are sufficient to support a prima facie case of discrimination."  *Id.* at 438; *see also Ramos*, 134 F. Supp. 2d at 338 (noting that making a prima facie case is a low burden).

### b.  Legitimate, Nondiscriminatory Reason

As discussed above, because Plaintiff makes out a prima facie case, the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802.  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  In essence, Defendant needs to "articulate a legitimate nondiscriminatory reason for its employment decision."  *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995).  Defendant has done so here, pointing to evidence that Plaintiff took too many breaks and that he lacked the ability to be a mechanic.  (*See* Pl.'s Counter 56.1 ¶¶ 20– 21; Def.'s Counter 56.1 ¶¶ 20–21.)  *See Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (holding that poor performance is a legitimate, non-discriminatory reason for adverse employment action); *Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 887 (N.D.N.Y. 1996) ("Failure to perform her job duties to the satisfaction of her supervisors, defendants' stated and well-documented reason for terminating plaintiff, is a legitimate, nondiscriminatory reason for discharging her."); *Everston v. State of N.Y. Mortg. Agency*, No. 89-CV-7474, 1992 WL

6190, at *7 (S.D.N.Y. Jan. 3, 1992) (noting that inadequate job performance can be a legitimate, nondiscriminatory reason for termination); *Charrette v. S.M. Flickinger Co.*, 806 F. Supp. 1045, 1060 (N.D.N.Y. 1992) (same).

<u>c.  Pretext</u>

If a defendant articulates a non-discriminatory reason, as Defendant has done here, the presumption of discrimination drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons.  *See, e.g., Reeves*, 530 U.S. at 142–43 (noting that, if the defendant can articulate a nondiscriminatory basis for the employment action, the burden returns to the plaintiff to show "by a preponderance of the evidence" that the defendant's given reason for the adverse employment action was false); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (explaining that the plaintiff must show that, "more likely than not[,] [discrimination] was the real reason" for the employment action (second alteration in original)).  Even though "the presumption of discrimination drops out . . . once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  *Reeves*, 530 U.S. at 143 (second alteration in original) (citation and internal quotation marks omitted).  The Supreme Court's decision in *Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469–70 (2d Cir. 2001) (internal quotation marks omitted).  "In seeking to show that there is a genuine issue of material fact for trial, the [nonmoving] party cannot rely on mere allegations, denials,

36

conjectures[,] or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial." *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); *see also Young v. Ltd. Brands*, No. 11-CV-2927, 2013 WL 5434149, at *4 (S.D.N.Y. Sept. 25, 2013) (noting that a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment, because mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." (alterations and internal quotation marks omitted)).

Plaintiff sets forth the following evidence:  First, according to Plaintiff, Hager told him that he took too many breaks, but when she provided examples as to times he allegedly was on break, Plaintiff asserted that he was actually working during those times.  (Pl.'s Counter 56.1 ¶ 20 (citing McCall Decl. ¶ 12).)  Second, Plaintiff has provided evidence that Defendant's assertion that Plaintiff was not qualified for his job was a pretext.  For example, Plaintiff asserts that after his demotion, he continued to perform the same work he had as a mechanic trainee. (Pl.'s Counter 56.1 ¶ 27 (citing McCall Decl. ¶ 13; Crum Decl. ¶ 8).)  Plaintiff asserts that he and Crum were able to perform jobs that other mechanics could not.  (Pl.'s Counter 56.1 ¶ 29 (citing Crum Decl. ¶ 8).)  And, as noted above, Plaintiff points to the fact that the only performance review he was given while working at Genpak stated that Plaintiff "[met] the qualifications of his job and more."  (Pl.'s 56.1 ¶ 104 (citing Watkins Aff'n Ex. 1 (Performance Review); Watkins Aff'n Ex. 1 (Performance Review).)  This evidence that Defendant's proffered reason was pretext, combined with the evidence of discrimination discussed with reference to Plaintiff's prima facie case, is sufficient evidence from which a jury could reasonably conclude that the

proffered reason for Plaintiff's demotion was pretextual and that racial discrimination was the real reason for the demotion.

### 3.  Termination

#### a.  Prima Facie Case

For the same reasons as discussed above, Plaintiff has established the first three elements of his prima facie case.  Indeed, the evidence of his qualification is even stronger for this claim because he was terminated after being demoted to the mechanic's helper job, and one review he received as a mechanic's helper was that he "me[t] the qualifications of his job and more."  (Pl.'s 56.1 ¶ 104 (citing Watkins Aff'n Ex. 1 (Performance Review)); Watkins Aff'n Ex. 1 (Performance Review).)

The Court thus turns to the fourth element, whether the termination occurred under circumstances giving rise to an inference of discrimination.  There are three layers of decision-making that took place, and thus three possible levels where the decision-makers could have acted with discriminatory intent.  First, Plaintiff's supervisors, including Schou, decided to write absence reports, leading to points being assigned.  (*See* Carpanini Decl. Ex. 10; Carpanini Reply Decl. Ex. E.)  Second, Carpanini calculated Plaintiff's point totals, and determined that he had twenty-four points.  (Def.'s 56.1 ¶ 126 (citing Carpanini Decl. ¶ 81).)  Third, based on Carpanini's calculation, Hager decided to terminate Plaintiff.  (*See* Def.'s 56.1 ¶ 127 (citing Carpanini Decl. ¶ 82; Carpanini Decl. Exs. 12–13); Pl.'s 56.1 ¶ 127.)

Plaintiff argues that Carpanini calculated his points incorrectly, and provides some evidence in support of that assertion.  *See* Watkins Aff'n ¶ 3.  However, there is simply no evidence whatsoever that Carpanini made any discriminatory comments or harbored any prejudice against Plaintiff.  (Def.'s 56.1 ¶ 111; Pl.'s 56.1 ¶ 111 (not disputing that portion of

Defendant's assertion); *see also* McCall Dep. Tr. 127 (admitting that Carpanini never called Plaintiff any racist names).)  Thus, although Carpanini may well have calculated Plaintiff's points under the Absentee Policy incorrectly, such that Plaintiff did not actually have twenty-four points at the time of his termination, Plaintiff offers no evidence whatsoever that would allow a jury to infer that Carpanini miscalculated the points under circumstances giving rise to an inference of discrimination.

However, there is also evidence that Schou acted as a decisionmaker, in reporting purported tardiness or absence.  *See Payne v. N.Y.C. Police Dep't*, 863 F. Supp. 2d 169, 182–83 (E.D.N.Y. 2012) (denying summary judgment based on evidence of discrimination by superior whose role in plaintiff receiving a negative performance review led to adverse employment action); *Augustin v. Enlarged City Sch. Dist. of Newburgh*, 616 F. Supp. 2d 422, 441, 446 (S.D.N.Y. 2009) (denying summary judgment where the plaintiff's direct supervisor made a remark that the jury could find evinced a discriminatory bias, and that supervisor "had great influence on the decision-making process that ultimately led to the denial of tenure to plaintiff and termination of plaintiff's employment"); *see also DiGirolamo v. MetLife Grp., Inc.*, No. 10-CV-1537, 2011 WL 2421292, at *3, *8 (S.D.N.Y. June 6, 2011) (considering whether the plaintiff proffered any evidence that age played a role in negative performance reviews the plaintiff received, which had led to adverse employment action), *aff'd*, 494 F. App'x 120 (2d Cir. 2012); *Hirschberg v. Bank of Am., N.A.*, 754 F. Supp. 2d 500, 518 (E.D.N.Y. 2010) (same).  The evidence shows that Plaintiff's supervisors, including Schou and Garrett, produced and signed Plaintiff's absence reports.  (*See* Carpanini Decl. Ex. 10; Carpanini Reply Decl. Ex. E.) According to Defendant, Plaintiff was correctly given three points for coming in late on February 18, 19, and 20, 2012.  (Pl.'s Counter 56.1 ¶ 56; Def.'s Counter 56.1 ¶ 56.)  However, there is an

issue of fact as to whether Plaintiff should have been marked as late on those days.  Plaintiff

claims that, based on the time that Schou told him to arrive, he clocked in early or on time

because he was expected to work late on those days.  (Pl.'s Counter 56.1 ¶ 57 (citing McCall

Decl. ¶ 19).)  Plaintiff declared that he worked from 11:26 AM until 12:06 AM on February 18,

2012, from 9:30 AM until 5:40 PM on February 19, 2012, and from 9:59 AM until 6:04 PM on

February 20, 2012.  (McCall Decl. ¶ 19.)  Plaintiff further declared that he reported for work at

the time he was told to by Schou.  (*Id.*)  Thus, according to Plaintiff, Schou told Plaintiff to come

in at a given time, then reported Plaintiff as tardy for arriving at that time, directly leading to his

termination.  Moreover, as discussed above, Plaintiff proffers evidence that Schou referred to

Plaintiff as a "nigger" on multiple occasions.  (Pl.'s Counter 56.1 ¶ 11 (citing Crum Decl. ¶ 4).)

Considering the factors described by the Second Circuit, these comments evince discriminatory

intent because the content of the remark is highly discriminatory, it was made by the

decisionmaker, and it was made repeatedly.  *See Henry*, 616 F.3d at 149 (noting that, in

"determining whether a remark is probative [of discriminatory intent], [courts in the Second

Circuit] have considered four factors: (1) who made the remark (*i.e.,* a decision-maker, a

supervisor, or a low-level co-worker); (2) when the remark was made in relation to the

employment decision at issue; (3) the content of the remark (*i.e.,* whether a reasonable juror

could view the remark as discriminatory); and (4) the context in which the remark was made

(*i.e.,* whether it was related to the decision-making process)"); *see also Back v. Hastings On

Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 n.12 (2d Cir. 2004) (indicating that comments

are not stray when they "were (1) made repeatedly, (2) drew a direct link between . . . stereotypes

and the conclusion that [the plaintiff] should not be tenured, and (3) were made by supervisors

who played a substantial role in the decision to terminate"); *Abdu-Brisson*, 239 F.3d at 468

("While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, . . . when other indicia of discrimination are properly presented, the remarks can no longer be deemed stray, and the jury has a right to conclude that they bear a more ominous significance." (citation and internal quotation marks omitted)).

This evidence is bolstered by additional evidence suggesting that Schou penalized Plaintiff at times he should not. The night before Plaintiff was demoted, Schou wrote a note for McCall's personnel file stating that Plaintiff did not stay for overtime when he should have on July 8, 2011 and July 9, 2011. (Pl.'s Counter 56.1 ¶ 24 (citing McCall Dep. Tr. 205–09); Def.'s Counter 56.1 ¶ 24; McCall Dep. Tr. 205–09.) However, on the evenings in question, Plaintiff claims that Schou was not present at the plant, and Plaintiff tried to reach him by phone but was unable to do so. (Pl.'s Counter 56.1 ¶ 25; Def.'s Counter 56.1 ¶ 25.) According to Plaintiff, the supervisors at the plant told Plaintiff to leave at the end of his shift at midnight. (Pl.'s Counter 56.1 ¶ 26 (citing McCall Dep. Tr. 205–09; Watkins Aff'n Ex. 7 (McCall Timesheet) (reflecting that Plaintiff clocked out at 12:12 AM on July 8, 2011 and at 12:00 AM on July 9, 2011, after 8.2 and 8 hour work days, respectively)).) Defendant disputes this, pointing to the note by Schou and Plaintiff's deposition, although the Court notes that nothing in Plaintiff's deposition testimony supports Defendant's position. (Def.'s 56.1 ¶ 26 (citing McCall Dep. Tr. 205–09; McCall Dep. Tr. 205–09.) This evidence, taken together, is sufficient for a finding that the termination occurred under circumstances giving rise to an inference of discrimination.

### b. Legitimate, Non-Discriminatory Reason

The burden then shifts to Defendant to proffer a legitimate non-discriminatory reason for its actions. Defendant has met that burden, proffering evidence that Carpanini calculated, and Miller confirmed, that Plaintiff had accrued twenty-four absence points, (Def.'s 56.1 ¶ 126

(citing Carpanini Decl. ¶ 81)), and that Genpak had a policy providing for termination once an

employee reaches twenty-four absence points, (Def.'s 56.1 ¶ 91; Pl.'s 56.1 ¶ 91).  *See, e.g.*,

*Henny v. New York State*, 842 F. Supp. 2d 530, 554 (S.D.N.Y. 2012) ("[The] [p]laintiff's lateness

and absences certainly suffice to establish a legitimate, non-discriminatory reason for her

treatment."); *Ebanks v. Neiman Marcus Grp., Inc.*, 414 F. Supp. 2d 320, 337 (S.D.N.Y. 2006)

("[The] [d]efendant has established a legitimate, non-discriminatory reason for [the plaintiffs']

termination—[one plaintiff's] lateness and [the other plaintiff's] lateness and frequent absences.

Each plaintiff received at least two written warnings, plus numerous oral admonitions,

concerning their attendance records.").

### c.  Pretext

Consequently, the presumption of discrimination drops out and Plaintiff then has the

burden of showing that "more likely than not[,] [discrimination] was the real reason" for the

decision to terminate Plaintiff.  *Van Zant*, 80 F.3d at 714 (second alteration in original).[15]

---

[15] With respect to Hager, even if Plaintiff met his burden of setting out his prima facie case based on Hager's decision to terminate Plaintiff based on his accrual of twenty-four absence points, summary judgment would nonetheless be warranted because there is insufficient evidence of pretext.  Because there is no evidence that Hager was the one who awarded Plaintiff absence points or calculated how many points he had, the relevant question is whether Hager applied the absence policy more harshly against Plaintiff than against white employees.  *See McBride-Crawford v. Gen. Mills Cereals Operations, Inc.*, No. 12-CV-1180, 2015 WL 4208608, at *7 (W.D.N.Y. July 9, 2015) ("The fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (alteration and internal quotation marks omitted)); *Krupa v. Dunkirk Specialty Steel, LLC*, No. 13-CV-76, 2014 WL 6387283, at *7 (W.D.N.Y. Nov. 14, 2014) (considering whether a reasonable jury could find that the employer "applied the absentee policy harshly toward her and leniently toward others because of her sex"); *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether [the] plaintiff can show any evidence that it was not the actual justification.  [The] [p]laintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even if he

has evidence that the decision was objectively incorrect." (citation, alteration, and internal quotation marks omitted)).

Here, the relevant undisputed evidence, as well as Plaintiff's evidence, shows the following. Hager was responsible for the decision to hire Plaintiff, and she did so knowing that he was African-American. (*See* Def.'s 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.) Plaintiff proffered evidence that Hager was hostile toward him throughout his employment at Genpak and that she treated him worse than she treated his white co-workers, (Pl.'s Counter 56.1 ¶ 30 (citing McCall Decl. ¶ 15; Crum Decl. ¶ 10)), pointing in particular to the chip bag incident in December 2011, (Pl.'s Counter 56.1 ¶¶ 39–41 (citing McCall Decl. ¶ 17)). Additionally, in November 2011, according to Plaintiff, Hager called him "Aunt Jemima." (Def.'s 56.1 ¶ 120; Pl.'s 56.1 ¶ 120; Pl.'s Counter 56.1 ¶ 31–32 (citing McCall Decl. ¶¶ 14–15; Crum Decl. ¶ 5).) Finally, there is evidence regarding four other employees terminated around the same time. Patrick Crowe, Jr. was terminated on January 24, 2012 because he had accumulated twenty-five points; Christina Barber was terminated on May 25, 2012 because she had accumulated twenty-seven points; Victoria Carpenter was terminated on November 16, 2012 because she had accumulated twenty-four points; and John Morgan was terminated on October 22, 2013 because he had accumulated twenty-four points. (Def.'s 56.1 ¶ 131 (citing Carpanini Decl. ¶ 86).) Finally, with regard to point calculations, the evidence shows that Carpanini, as well as Union representatives, reviewed the time and attendance of all employees at the end of each four-week block of time. (Def.'s 56.1 ¶ 54 (citing Carpanini Decl. ¶ 15).)

Plaintiff argues that he has produced sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false. In particular, Plaintiff points to the fact that two white employees were permitted to accrue more than twenty-four points before being terminated as evidence that the legitimate reason for terminating Plaintiff was false. (*See* Pl.'s 56.1 ¶ 131.) However, the evidence shows that two of the four white employees were fired for accumulating twenty-four points. (*See* Def.'s 56.1 ¶ 131.) Moreover, the two employees who accrued more than twenty-four points were just over twenty four, (*see id.*), and there is a more rational explanation for the fact that they were permitted to accrue more than twenty-four points, namely that certain actions received multiple points under the policy, and that the point totals were calculated every four weeks, such that Genpak may not have realized that an employee had reached twenty-four absence points until he or she had in fact reached twenty-five or more points. Indeed, Carpanini determined that Plaintiff had received his twenty-fourth absence point on February 20, 2012. (*See* Def.'s 56.1 ¶ 126 (citing Carpanini Decl. ¶ 81); *see also* Watkins Aff'n Ex. 4 (Employee Data Calendar).) However, Carpanini did not make this determination until March 1, 2012. (*See* Def.'s 56.1 ¶ 126 (citing Carpanini Decl. ¶ 81).) Thus, had Plaintiff been late or absent between February 20, 2012 and March 1, 2012, he would have had more than twenty-four points at the time he was terminated.

Additionally, Plaintiff does not dispute that he was frequently late or absent, merely asserting that he was awarded some points he should not have been and that the points were calculated incorrectly. (Pl.'s Counter 56.1 ¶¶ 46–61 (citing Watkins Aff'n ¶ 3).) Furthermore, the fact that Plaintiff got progressive warnings at the six-point mark, the twelve-point mark, and the sixteen-point mark, further undercuts Plaintiff's claim that the proffered reason for the termination was pretextual. (*See* Def.'s 56.1 ¶ 94; Pl.'s 56.1 ¶ 94.) In sum, there is insufficient evidence from which a jury could conclude that Hager either (1) knew that Plaintiff's points were calculated incorrectly and, with discriminatory motive, used that incorrect calculation as a

According to Plaintiff, Schou told Plaintiff to arrive at work late, and then marked him as late, resulting in his termination.  (*See* Pl.'s 56.1 ¶ 126 (not denying that Carpanini had determined that Plaintiff accumulated twenty-four points but instead denying that Defendant had made such a determination in "good faith"); Pl.'s Counter 56.1 ¶¶ 56–57 (citing McCall Decl. ¶ 19); Carpanini Decl. Ex. 10 (indicating that McCall's supervisors, including Schou and Garrett, produced and signed Plaintiff's absence reports); Carpanini Reply Decl. Ex. E (same).)  This evidence is sufficient to show that the reason for the termination was pretextual, and when combined with Plaintiff's evidence that Schou referred to Plaintiff as a "nigger" on multiple occasions, (Pl.'s Counter 56.1 ¶ 11 (citing Crum Decl. ¶ 4)), is sufficient evidence from which a jury could reasonably conclude that the proffered reason for Plaintiff's termination was pretextual and that racial discrimination was the real reason for the termination.  *See Payne*, 863 F. Supp. 2d at 183–84 (denying summary judgment on race discrimination claim where there was evidence of comments that could be seen as discriminatory by a superior who affected the plaintiff's performance review score, where the performance review scores were the basis for the plaintiff's termination); *Everson v. N.Y.C. Transit Auth.*, No. 02-CV-1121, 2007 WL 539159, at *11 (E.D.N.Y. Feb. 16, 2007) (denying summary judgment and holding that evidence of the decisionmaker using the word "nigger" one time, combined with evidence that another employee had heard the decisionmaker make similar remarks and that the plaintiff was better qualified than the employee ultimately promoted, was sufficient evidence to go to the jury on a claim for discriminatory failure to promote); *cf. Sedelnik v. City of Bridgeport*, 837 F. Supp. 2d 12, 19–20

---

pretext for terminating him, or (2) terminated him based on his accrual of twenty-four points and would not have done so if he were not African-American.  Indeed, there is insufficient evidence from which a jury could conclude that the asserted reason "was so lacking in merit as to call into question its genuineness."  *Miller*, 703 F. Supp. 2d at 247 (internal quotation marks omitted).

(D. Conn. 2011) (holding that evidence that people in high positions of authority, who may not even have been the decisionmakers, made stray remarks about the plaintiff's age was sufficient evidence to deny summary judgment in age discrimination case).  Therefore, Defendant's Motion for Summary Judgment on this claim is denied.

### 4.  Retaliation

#### a.  Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) Defendant was aware of this activity; (3) Defendant took adverse action against Plaintiff; and (4) there was a causal connection between the adverse action and the protected activity, i.e., that a retaliatory motive played a part in the adverse employment action. S*ee Kessler v. Westchester Cty. Dep't of Soc. Serv.*, 461 F.3d 199, 205–06 (2d Cir. 2006); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 529 (S.D.N.Y. 2002).  Proof of causation can be shown either: (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.  *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Gilford v. City of New York*, No. 03-CV-91, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004) (quoting *Gordon*, 232 F.3d at 117), *aff'd*, 136 F. App'x 390 (2d Cir. 2005).  However, even if Plaintiff states a prima facie case, retaliation claims are still subject to *McDonnell Douglas* burden shifting.  *See Sumner*, 899 F.2d at 209.

Plaintiff proffers evidence from which a jury could conclude he engaged in protected activity.  For example, Plaintiff says he complained to Schou about racial harassment by

co-workers, including by Decker and Walker in the spring or early summer of 2011.  (Pl.'s

Counter 56.1 ¶ 16 (citing McCall Decl. ¶ 10).)  Plaintiff also claims that he reported Hager's

November 2011 "Aunt Jemima" comment to Steve Derisi, a manager in the engineering

department, and to Carpanini, but does not provide evidence as to exactly when he reported the

comment.  (*See* Pl.'s 56.1 ¶ 121 (citing McCall Decl. ¶¶ 14–16); McCall Decl. ¶¶ 14–16.)

Plaintiff further claims that, at the same time he reported the Aunt Jemima comment, he reported

to Carpanini that he had also been subjected to racial slurs and jokes by Decker and others.  (Pl.'s

Counter 56.1 ¶ 36 (citing McCall Decl. ¶ 16).)

 Regarding the first element of a prima facie case, "[w]hile . . . protected activity generally

involves the filing of a formal complaint of discrimination with an administrative agency, the

Second Circuit has recognized that 'protected activity' includes 'informal protests of

discriminatory employment practices, including making complaints to management.'"  *Risco v.*

*McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citation omitted) (quoting *Sumner*, 899 F.2d

at 209) (citing *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992)); *see*

*also Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) ("Informal

complaints to supervisors, instituting litigation, or filing a formal complaint are protected

activities under Title VII." (internal quotation marks omitted)); *Martin v. State Univ. of N.Y.*, 704

F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that informal complaints to

supervisors constitute protected activity under Title VII." (internal quotation marks omitted)).

"[S]uch informal complaints[,] [however,] must be sufficiently specific to make it clear that the

employee is complaining about conduct prohibited by Title VII."  *Risco*, 868 F. Supp. 2d at 110.

Thus, there is an issue of fact as to whether Plaintiff engaged in protected activity by

complaining to Carpanini, Schou, and Derisi that he had been subjected to racial jokes and slurs by Hager, Walker, and Decker, among others.

Next, crediting Plaintiff's evidence, the second requirement is also met, as general corporate knowledge of Plaintiff's protected activity is sufficient to make out a prima facie case. *See Kessler*, 461 F.3d at 210 ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." (citing *Gordon*, 232 F.3d at 116)).  Thus, construing all facts in the light most favorable to Plaintiff, Plaintiff has met the minimal burden of showing general knowledge of his protected activity.

As for the third element, Plaintiff points to the alleged adverse employment actions described above, namely his demotion and termination.[16]  An adverse action for a retaliation

---

[16] The Court notes that one other action referred to by Plaintiff could potentially constitute an adverse employment action.  Plaintiff has proffered evidence that, after he complained to Schou, Schou did not take remedial action but merely started to treat Plaintiff worse than he did previously.  (Pl.'s Counter 56.1 ¶ 17 (citing McCall Decl. ¶ 10; Crum Decl. ¶ 7 (declaring that Plaintiff and Crum were "regularly assigned the worst, most dangerous jobs")).)

Events that do not constitute adverse employment actions for Plaintiff's intentional discrimination claim may still be considered in the context of his retaliation claim.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he anti[-]retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  This does not mean that all potential workplace grievances are fodder for retaliation claims, however.  *See id.* at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth a general civility code for the American workplace." (internal quotation marks omitted)).  To constitute an adverse action for a retaliation claim, the allegedly retaliatory action must be "materially adverse;" in other words, it must be the type of action that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57; *see also Kessler*, 461 F.3d at 207 (same).

However, Plaintiff's evidence that Schou treated him worse following his complaint is insufficient because Plaintiff does not provide enough evidence for the Court to conclude that the action taken by Schou is of the type that would dissuade a reasonable worker from complaining about discrimination.  Indeed, Plaintiff does not argue otherwise.  It also is informative that the actions allegedly taken by Schou after Plaintiff complained to him in the spring or summer of

claim need not "bear on the terms or conditions of employment;" rather, "the proper inquiry now is whether 'the employer's actions [were] harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *See Hicks v. Baines*, 593 F.3d 159, 169 (2d Cir. 2010) (alteration in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  Demotion and termination, actions that do bear on the terms and conditions of employment, are clearly adverse actions under this broad standard.  *See, e.g.*, *Mariama Amar v. N.Y.C. City Health & Hosps. Corp.*, No. 14-CV-2503, 2015 WL 3754999, at *10 (S.D.N.Y. June 15, 2015) ("While the anti-retaliation provision of Title VII is not limited to discriminatory actions that relate to the terms and conditions of employment, a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished internal responsibilities, or other indices unique to a particular situation may be considered materially adverse actions." (alteration, citation, and internal quotation marks omitted)); *cf. Petyan*, 2015 WL 4104841, at *3 n.8 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (alteration in original) (internal quotation marks omitted) (quoting *Feingold*, 366 F.3d at 152)); *Ren Yuan Deng v. N.Y. State Office of Mental Health*, No. 13-CV-6801, 2015 WL 221046, at *15 (S.D.N.Y. Jan. 15, 2015) (noting in context of Family and Medical Leave Act retaliation claim that "[i]t is well-established that termination and wage deduction are adverse employment actions.").  Thus, Plaintiff has met this requirement.

---

2011 did not dissuade Plaintiff from allegedly making further complaints in or around November 2011.  (*See* Pl.'s Counter 56.1 ¶¶ 16, 31–38.)

Accordingly, the Court turns to whether Plaintiff has presented evidence to suggest that "a causal connection exist[ed] between the protected activity and the adverse action." *Kessler*, 461 F.3d at 206 (internal quotation marks omitted).  Plaintiff relies primarily on the temporal relationship, arguing that it is sufficient that he complained of discrimination to Schou in late spring or early summer 2011, (Pl.'s Counter 56.1 ¶ 16), shortly before his demotion in July 2011, and that he complained to Carpanini in or after November 2011, (Pl.'s Counter 56.1 ¶¶ 31–38), a few months before his termination in March 2012, (*see* Def.'s 56.1 ¶ 128; Pl.'s 56.1¶ 128). Plaintiff also points to the other evidence of discrimination discussed above as evidence of retaliation.

"[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation.").  Here, it is not entirely clear how much time elapsed between Plaintiff's complaint to Schou in "spring or summer 2011," (*see* Pl.'s Counter 56.1 ¶ 16), and his demotion in July 2011, (*see* Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14), but no more than three or four months elapsed between Plaintiff's complaint in November 2011 and his termination on March 2, 2012.  The case law in the Second Circuit is unclear with regard to how much time can pass between a protected action and the adverse employment action before no causal connection can be inferred, but the Second Circuit has emphasized that it has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a

federal constitutional right and an allegedly retaliatory action." *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Littlejohn v. City of New York*, — F. 3d —, 2015 WL 4604250, at *15 (2d Cir. Aug. 3, 2015) (same); *Perez v. N.Y. State Office of Temp. & Disability Assistance*, No. 14-CV-1621, 2015 WL 3999311, at *8 (S.D.N.Y. June 30, 2015) (same).  And while some courts have held that three months is too long to draw a causal inference based on the temporal relationship, others have held that fact finders could draw temporal inferences from gaps between protected action and adverse employment actions of three months or, indeed, much longer.  *Compare Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 209 (E.D.N.Y. 2009) (holding that a gap of "two and three months after the complaints . . . is a sufficiently short gap to permit a reasonable inference of retaliation at the *prima facie* stage") *and Pergament v. Fed. Express Corp.*, No. 03-CV-1106, 2007 WL 1016993, at *14 (E.D.N.Y. Mar. 30, 2007) (holding that gaps of two and half months and less than a month "suffice[] to satisfy [the plaintiff's] burden of showing indirect causation") *with Cobian v. New York City*, No. 99-CV-10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) ("Standing alone, the lapse of more than four months . . . is insufficient evidence of a causal connection."), *aff'd*, 23 F. App'x 82 (2d Cir. 2001); *see also Gorman-Bakos*, 252 F.3d at 554 (collecting cases). On balance, a jury could conclude that Plaintiff has sufficiently set out a prima facie case for retaliation based on the relatively short gap between protected activity and demotion and termination, especially when combined with his other evidence of discriminatory animus.

### b.  Legitimate, Non-Discriminatory Reason

Because Plaintiff has made out a prima facie case for retaliation, the burden then shifts to Defendant to provide a legitimate, non-discriminatory reason for its actions.  Here, the actions at issue are Plaintiff's demotion and termination, the same actions that are the subject of Plaintiff's

discrimination claims.  As discussed in detail above, Defendant proffers legitimate reasons for its actions—that Plaintiff was not performing adequately as a mechanic trainee and that Plaintiff had accrued twenty-four absence points, which mandated dismissal under the terms of the CBA.

### c.  Pretext

The burden then shifts again to Plaintiff who must put forth evidence that the reason given was pretextual.  "Once the first two steps of the burden-shifting test have been satisfied, 'the *McDonnell Douglas* framework disappears,' and 'the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason for the allegedly retaliatory conduct is a pretext.'"  *Villanti v. Cold Spring Harbor Cent. Sch. Dist.*, 733 F. Supp. 2d 371, 384 (E.D.N.Y. 2010) (brackets omitted) (citations omitted) (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002), *superseded by statute on other grounds*, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat 3553; *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).  As noted, "[t]he plaintiff may do this by presenting additional evidence, or by relying on the evidence that supported the plaintiff's prima facie case."  *Id.*  However, although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . [;] without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext."  *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *see also Martel v. New England Home Care, Inc.*, No. 09-CV-1412, 2014 WL 3687738, at *15–16 (D. Conn. July 22, 2014) (same).  "Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact."  *El Sayed*, 627 F.3d at 933.

With respect to Plaintiff's demotion and termination claims, the temporal proximity, combined with the evidence of pretext discussed in detail above, is sufficient to create a triable

issue of fact, and Defendant's Motion for Summary Judgment is denied as to the retaliatory

demotion and termination claims.

### 5.  Hostile Work Environment

"In order to prevail on a hostile work environment claim, a plaintiff must make two

showings." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (internal quotation marks

omitted).  First, the plaintiff must show "that the harassment was sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment."

*Id.* (internal quotation marks omitted).  Second, the plaintiff must show "that there is a specific

basis for imputing the conduct creating the hostile work environment to the employer."  *Id.*

(internal quotation marks omitted).  The Court will address each requirement in turn.

### a.  Establishing a Hostile Work Environment

A plaintiff can state a cause of action under Title VII by demonstrating that his or her

working environment is "overrun by racial antagonism."   *Lopez v. S.B. Thomas, Inc.*, 831 F.2d

1184, 1189 (2d Cir. 1987).  A hostile work environment claim is evaluated under the same

standard under Title VII as under the NYSHRL, *see Marchuk v. Faruqi & Faruqi, LLP*, — F.

Supp. 3d. —, 2015 WL 363625, at *2 (S.D.N.Y. Jan. 28, 2015), and § 1981, *see Whidbee*, 223

F.3d at 69; *see also Massie v. Metro. Museum of Art*, No. 11-CV-9549, 2015 WL 3833839, at *6

(S.D.N.Y. June 22, 2015) ("[The plaintiff's] Title VII and NYSHRL discharge and hostile work

environment claims are analyzed like his § 1981 claims for the same . . . ."); *Parra v. City of

White Plains*, 48 F. Supp. 3d 542, 551 n.2 (S.D.N.Y. 2014) ("The same standards govern hostile

work environment claims under Title VII, Section 1981, and the NYSHRL.").

To prove a hostile work environment claim, Plaintiff must produce evidence that "the

workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was]

sufficiently severe or pervasive to alter the conditions of the victim's employment." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004) (internal quotation marks omitted); *see also Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723–24 (2d Cir. 2010) ("In order to establish a hostile work environment claim under 42 U.S.C. § 1981, a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." (internal quotation marks omitted)).  Though a single incident may be severe enough to materially alter employment conditions, *see Patterson*, 375 F.3d at 227, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive[,]'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)).  The test for determining whether a workplace is a hostile work environment has both subjective and objective elements.  *See Alfano*, 294 F.3d at 374.  "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Harris*, 510 U.S. at 21–22 (holding that conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and the plaintiff must "subjectively perceive the environment to be abusive"); *Parra*, 48 F. Supp. 3d at 551 ("The sufficiency of a hostile work environment claim is analyzed both subjectively and objectively.").

When determining whether an objectively hostile work environment exists, courts must consider the totality of the circumstances, including the frequency, severity, and offensiveness of the allegedly discriminatory conduct, whether the conduct was physically threatening or

humiliating, and whether it unreasonably interfered with an employee's work performance.  *See Patterson*, 375 F.3d at 227.  The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis."  *See Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009).  "Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner."  *Id.* (internal quotation marks omitted).  Even still, "an employer's motion for summary judgment must be denied if the claimed misconduct ranks sufficiently highly on either axis."  *Id.* "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law."  *Patterson*, 375 F.3d at 227.  Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."  *Richards v. N.Y.C. Dep't of Educ.*, No. 13-CV-16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015) (internal quotation marks omitted) (quoting *Tolbert*, 790 F.3d at 439).

Crediting his evidence, Plaintiff has proffered sufficient evidence for a jury to find that a hostile work environment existed.  There is evidence that, when he was a mechanic's helper, Plaintiff was assigned primarily to work with Walker.  (Pl.'s Counter 56.1 ¶ 4 (citing McCall Decl. ¶ 6).)  Plaintiff claims that Walker "regularly referred to McCall as 'Boy,'" and also referred to him as "Black Boy" and "told him to move his 'black ass.'"  (Pl.'s Counter 56.1 ¶ 5 (citing McCall Decl. ¶ 6; McCall Dep. Tr. 235–36).)  Plaintiff also claims that, after Plaintiff became a mechanic trainee, Walker threatened to fight Plaintiff and, when Plaintiff tried to walk

away, Walker rammed into him, causing Plaintiff's lip to bleed.  (*See* Pl.'s Counter 56.1 ¶ 14

(citing McCall Decl. ¶ 9).)  Plaintiff also claims that other co-workers regularly used racial slurs

and made racial jokes in Plaintiff's presence and outside of his presence.  (Pl.'s Counter 56.1 ¶ 8

(citing McCall Decl. ¶ 7; Crum Decl. ¶ 4).)  For example, Plaintiff claims that a senior mechanic,

Decker, told Plaintiff that Decker's dog was named "Nigger," and referred to menial tasks

Plaintiff was assigned to as "nigger work."  (Pl.'s Counter 56.1 ¶¶ 12–13 (citing McCall Decl.

¶ 8).)  Plaintiff also has submitted evidence from Crum that co-workers and managers regularly

referred to Plaintiff as a "nigger."  (Pl.'s Counter 56.1 ¶ 10 (citing Crum Decl. ¶¶ 4, 10).)  In

particular, Crum has stated that Schou referred to Plaintiff as a "nigger" on multiple occasions.

(Pl.'s Counter 56.1 ¶ 11 (citing Crum Decl. ¶ 4).)  According to Crum, Plaintiff and Crum,

because Crum worked with Plaintiff, were regularly assigned the most dangerous jobs in the

Maintenance Department.  (Pl.'s Counter 56.1 ¶ 17 (citing Crum Decl. ¶ 7); *see also* Crum Decl.

¶ 10 (declaring he was treated badly because he worked with Plaintiff).)  Furthermore, Plaintiff

has proffered that he found the above comments offensive.  For example, Plaintiff has stated that

he made it clear he did not appreciate Walker's comments, (*see* Pl.'s Counter 56.1 ¶ 7 (citing

McCall Decl. ¶ 6)), that Plaintiff found it "very offensive" when Decker told Plaintiff that

Decker's dog was named "Nigger," (*id.* ¶ 12 (citing McCall Decl. ¶ 8)), and that Plaintiff was

offended by Hager referring to him as "Aunt Jemima," (*id.* ¶¶ 32–33 (citing McCall Decl. ¶ 15;

Crum Decl. ¶ 5)).

Plaintiff has provided sufficient evidence that he was subjected to severe racially

discriminatory language with frequency.  For example, the use of the word "boy," even by itself,

can be evidence of "racial animus," depending on "various factors including context, inflection,

tone of voice, local custom, and historical usage."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456

(2006) (rejecting the argument that the word "boy" is only "evidence of discriminatory intent" "when modified by a racial classification like 'black' or 'white'" (some internal quotation marks omitted)).  Furthermore, the repeated use of the word "nigger" by Decker, as well as by managers, could result in a reasonable jury finding that there was a hostile work environment. Indeed, the Second Circuit has "emphasiz[ed] that perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2012) (brackets and internal quotation marks omitted).  And courts have held that even one use of the word "nigger," depending on the circumstances, is sufficient to go to a jury on a hostile work environment claim.  *See, e.g.*, *Lovejoy v. Gure-Perez*, No. 10-CV-5748, 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014) ("Even if [the] plaintiff established that being called 'nigger' was the only incident of racial animus, this would suffice for a hostile work environment claim.  Plaintiff testified that she was called 'nigger' by her supervisor in an aggressive and intimating tone, with saliva falling onto her body, and loudly enough for others to hear it."), *appeal withdrawn* (Jan. 16, 2015).  Moreover, the mere fact that Schou's use of the word "nigger" allegedly occurred outside of earshot of Plaintiff is not in itself dispositive.  Rather, "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997). Here, it is not exactly clear when Plaintiff learned of these alleged comments, but they provide additional evidence for Plaintiff's claim.  Moreover, Plaintiff's short tenure at Genpak means that all of these events occurred within eighteen months.  (*See* Def.'s 56.1 ¶¶ 5, 128–29; Pl.'s 56.1 ¶¶ 128–29.)  Finally, Plaintiff's evidence that he was regularly assigned the most dangerous

jobs, that Walker threatened to fight him and rammed into him, and that Hager treated him worse than white employees bolsters Plaintiff's contention that a jury could conclude that Plaintiff has established a hostile work environment claim.  *See Rivera*, 743 F.3d at 24 ("The use of racially offensive language is particularly likely to create a hostile work environment when, as here, it is presented in a physically threatening manner." (internal quotation marks omitted)).  For the foregoing reasons, the Court concludes that Plaintiff has provided sufficient evidence from which a jury could conclude that a hostile workplace existed.

### b.  Employer Liability

In addition to showing that a hostile work environment existed, "in order to establish employer liability under Title VII[,] [§ 1981,] and the NYSHRL for hostile actions taken by employees, a plaintiff must establish that the hostile work environment can be imputed to the employer."  *See Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *25 (E.D.N.Y. Sept. 24, 2014); *see also Whidbee*, 223 F.3d at 72 ("To prevail on their § 1981 claims the plaintiffs must show . . . a specific basis . . . for imputing the conduct that created the hostile environment to the employer." (second alteration in original) (internal quotation marks omitted)).

### i.  Federal Law

The Supreme Court recently set out the following framework for when an employer should be liable for harassment by employees under *federal* law, that is, under Title VII or § 1981.

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable

care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  Although *Vance* concerned Title VII, *see id.*, the Second Circuit has applied its framework and holdings to hostile work environment claims under § 1981, *see Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113–14 (2d Cir. 2015).

If the harassing employee is a co-worker, to show negligence by the employer in controlling work conditions, a plaintiff must "demonstrate that the employer has either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *See Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 460 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014). If an employer has notice of the harassment, i.e. that it knew or should have known, the "law imposes upon the employer a duty to take reasonable steps to eliminate it."  *See id.* (internal quotation marks omitted); *see also Dillon v. Ned Mgmt., Inc.*, No. 13-CV-2622, 2015 WL 427921, at *10 (E.D.N.Y. Feb. 2, 2015) ("The employer is not liable unless it either (1) provided no reasonable avenue for complaint, or (2) knew of the harassment and did nothing about it.").

Here, there is evidence from which a jury could conclude that Plaintiff's co-workers, notably Decker and Walker, were responsible for the hostile work environment.  The evidence shows that Defendant provided a reasonable avenue for complaint and is thus not liable on that basis.  However, Plaintiff has offered evidence from which a jury could conclude that Defendant knew about the harassment and took no steps to eliminate it.  Specifically, Plaintiff claims that in spring or early summer of 2011, he complained to Schou about racial harassment by co-workers, including by Decker and Walker.  (Pl.'s Counter 56.1 ¶ 16 (citing McCall Decl. ¶ 10).) According to Plaintiff, after he complained to Schou, Schou did not take remedial action but

merely started to treat Plaintiff worse than he did previously.  (Pl.'s Counter 56.1 ¶ 18 (citing

McCall Decl. ¶ 10; Crum Decl. ¶ 7 (declaring that Plaintiff and Crum were "regularly assigned

the worst, most dangerous jobs")).)  Plaintiff further claims that he in fact went to Carpanini and

reported Hager's "Aunt Jemima" comment, as well as about how he had been subjected to racial

slurs and jokes by Decker and others.  (Pl.'s Counter 56.1 ¶ 36 (citing McCall Decl. ¶ 16).)

According to Plaintiff, Carpanini told McCall she would file a report with her boss, but Plaintiff

never heard back from her about his complaint.  (Pl.'s Counter 56.1 ¶¶ 37–38 (citing McCall

Decl. ¶ 16).)  Thus, a jury could conclude from this evidence that Defendant knew about the

racial harassment and did nothing.

    As noted above, different rules apply if the harasser is a supervisor.  First, the Supreme

Court has defined supervisor as someone empowered by the employer "to take tangible

employment actions against the victim, i.e., to effect a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits."  *See Vance*, 133 S. Ct. at

2443 (internal quotation marks omitted).  Under *Burlington Industries, Inc. v. Ellerth*, 524 U.S.

742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), "if a supervisor's

harassment culminates in a tangible adverse employment action, the employer is strictly liable

for that supervisor's harassment."  *Setelius*, 2014 WL 4773975, at *25; *see also Redd v. N.Y.

Div. of Parole*, 678 F.3d 166, 182 (2d Cir. 2012) ("If the 'harassment culminate[d] in a tangible

employment action, such as discharge, demotion, or undesirable reassignment,' the employer is

held strictly liable, and '[n]o affirmative defense is available.'" (alterations in original) (quoting

*Ellerth,* 524 U.S. at 765)).  "But if no tangible employment action is taken as a result of the

harassment, or if any tangible employment action taken against the employee was not part of the

supervisor's discriminatory harassment, the employer may raise an affirmative defense."
*Setelius*, 2014 WL 4773975, at *25 (internal quotation marks omitted).  Turning to the
affirmative defense available to employers, "[w]ith respect to the first prong of this defense, an
employer 'need not prove success in preventing harassing behavior in order to demonstrate that it
exercised reasonable care' and 'the existence of an anti-harassment policy with complaint
procedures is an important consideration.'"  *Grant v. United Cerebral Palsy of N.Y.C., Inc.*, No.
11-CV-18, 2014 WL 902638, at *9 (S.D.N.Y. Mar. 7, 2014) (quoting *Leopold v. Baccarat, Inc.*,
239 F.3d 243, 245 (2d Cir. 2001)).  With respect to the second prong of the defense, "the
employer must show that the plaintiff 'acted unreasonably in failing to avail herself of the
company's internal complaint procedures,' and then the burden shifts to the employee to 'come
forward with one or more reasons why the employee did not make use of the procedures.'"
*Grant*, 2014 WL 902638, at *9 (quoting *Leopold*, 239 F.3d at 246).

The evidence shows that a jury could conclude that Plaintiff's supervisors contributed to
the hostile work environment.  In particular, the jury could conclude that Hager and Schou were
Plaintiff's supervisors and their discriminatory comments contributed to the hostile work
environment.  The jury also could reasonably find that racial harassment by both Hager and
Schou culminated in an adverse employment action—Plaintiff's demotion and termination.  If a
jury so concluded, then Defendant would be strictly liable and no affirmative defense would be
available.  Furthermore, factual issues preclude summary judgment even if the affirmative
defense is available.  Notably, Plaintiff provided evidence that he complained to Carpanini and
Schou about racial harassment and nothing was done and that he then spoke to his union
representative, Leigh Miller, about the racial harassment, and that Miller "told him 'not to rock
the boat' and that [Miller] did not want to hear about it from [P]laintiff."  (Pl.'s Counter 56.1

¶ 18 (citing McCall Decl. ¶ 11).)  Thus, the jury could decide that Plaintiff had a valid reason for not following the procedures provided by his employer, as doing so might have been, or appeared to have been, futile.  *See Redd*, 678 F.3d at 183  (holding that summary judgment was inappropriate because, "if the affirmative defense [was] available, there appear[ed] to be a factual dispute to be resolved as to the sufficiency of [the plaintiff's] complaints about [the supervisor's] conduct"); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010) ("There is no requirement that a plaintiff exhaust all possible avenues made available where circumstances warrant the belief that some or all of those avenues would be ineffective or antagonistic.").

### ii.  New York Law

Under New York law, unlike under federal law, "an employer is never strictly liable for the conduct of employees, even if the harassing employee is a Plaintiff's supervisor."  *Marchuk*, 2015 WL 363625, at *2; *see also Sesay-Harrell v. N.Y.C. Dep't of Homeless Servs.*, No. 12-CV-925, 2013 WL 6244158, at *24 (S.D.N.Y. Dec. 2, 2013) (noting limited circumstances under which liability can be imputed to employer for hostile work environment claims under New York law); *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013) (same); *State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp.*, 487 N.E.2d 268, 269 (N.Y. 1985) ("An employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." (internal quotation marks omitted)).  Rather, under New York law, "[a]n employer is only liable for conduct that it encouraged, condoned, or expressly or impliedly approved."  *Marchuk*, 2015 WL 363625, at *2.  The New York Court of Appeals has held that "[c]ondonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense," and "[a]n employer's

calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *St. Elizabeth's Hosp.*, 487 N.E.2d at 269.  Here, as discussed above, Plaintiff claims he complained multiple times about the racial harassment and no corrective action was taken, which evidence would permit a jury to decide that the employer condoned it. *See Guzman v. Macy's Retail Holdings, Inc.*, No. 09-CV-4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010) (holding that an allegation that the plaintiff complained to her employer's human resources regional vice president and he "not only refused to investigate but threatened her with termination if she made further complaints to senior level management" was sufficient to establish condonation under New York law); *Melendez v. Int'l Serv. Sys., Inc.*, No. 97-CV-8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr. 6, 1999) (holding that the plaintiff's allegation that he "reported his discriminatory treatment . . . to numerous people up the chain of command in the management . . . , yet no remedial action was taken" was sufficient under New York law); *Seepersad v. D.A.O.R. Sec., Inc*., No. 97-CV-2086, 1998 WL 474205, at *5 (S.D.N.Y. Aug. 12, 1998) (holding that summary judgment on NYSHRL claim was inappropriate when there were factual questions regarding the plaintiff's complaints and the corrective action taken in response).  Therefore, Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim is denied.

III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied.  The

Clerk of the Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 21.)

SO ORDERED.

Dated:         September 30, 2015
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE